# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHAUNA I. WHITE | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0382 (RJL) |
| | ) | ECF |
| HENRY M. PAULSON, JR., | ) | |
| Secretary of the Treasury | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **DEFENDANT'S MOTION FOR PARTIAL DISMISSAL**

Plaintiff brings this action against Henry M. Paulson, Secretary of the Treasury ("Defendant") pursuant to Title VII of 1964 Civil Rights Act, 42 U.S.C. § 2000e-5, and the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k).

Defendant hereby moves pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6) to partially dismiss the complaint for Plaintiff's failure to exhaust administrative remedies. Plaintiff's claim of alleged discrimination based sex (female) on the basis of pregnancy is untimely and should be dismissed.

In support of this Motion, Defendant respectfully refers the Court to the accompanying Memorandum of Points and Authorities and attached exhibits. Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. See L. Civ. R. 7(m).

Dated: July 11, 2008

Respectfully submitted,

_/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_/s/_____
MEGAN M. WEIS
Special Assistant U.S. Attorney
United States Attorney's Office
Civil Division
555 4th Street, NW
Washington, D.C. 20530

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHAUNA I. WHITE | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0382 (RJL) |
| | ) | ECF |
| HENRY M. PAULSON, JR., | ) | |
| Secretary of the Treasury | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL DISMISSAL

For the reasons stated below, Defendant Henry M. Paulson, Secretary of the Treasury ("Defendant"), hereby respectfully moves, pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6), to partially dismiss the complaint ("Complaint") filed by Shauna I. White ("Plaintiff") in this action.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff is a former HR Program Coordinator, NB-04, at the Office of Comptroller of the Currency ("OCC") in the United States Department of Treasury ("Defendant" or "Agency"). See Plaintiff's Complaint at ¶ 7 (Dkt. No. 1).

Shortly after her return from maternity leave on October 3, 2005, Plaintiff met with Laurie Cymbor, a representative of the Agency's Workplace Fairness and Equal Opportunity Division (formerly Workplace Fairness and Alternative Resolutions or WFAR). See Exhibit 1, Declaration of Laurie Cymbor, ("Ex. 1") at ¶ 2. Plaintiff discussed her concern that her personal possessions had been packed away while she was on maternity leave. Id. According to Ms.

Cymbor, Plaintiff appeared emotionally distressed regarding both her professional and personal situations. Id. Ms. Cymbor recommended that Plaintiff contact the OCC's Employee Assistance Program. Id.

In a subsequent meeting between the Ms. Cymbor and Plaintiff on October 11, 2005, Ms. Cymbor requested Sophia Thornton, OCC Complaints Team Leader, to join them. Ex. 1 at ¶ 3; Exhibit 2, Declaration of Sophia Thornton Eaves, ("Ex. 2") at ¶ 1-2. Ms. Cymbor explained to Plaintiff that the Agency's Fair Alternatives and Innovative Resolutions ("FAIR") program allows parties to mediate nondiscriminatory workplace issues, such as communications issues, different perceptions, personality differences, and misunderstandings. Ex. 1 at ¶ 3; See Exhibit 3, FAIR Brochure, ("Ex. 3"). Ms. Cymbor also explained that Plaintiff could utilize the FAIR process at any time because there were no applicable statutory time frames. Ex. 1 at ¶ 3.

At the meeting, Ms. Cymbor also stated that, if Plaintiff believed she was being discriminated against, she could seek Equal Employment Opportunity ("EEO") counseling. See Ex. 1; Ex. 2. Both Ms. Cymbor and Ms. Thornton advised plaintiff that her complaint would be considered timely if she requested EEO counseling within 45 calendar-days of the date she became aware of an alleged discriminatory event. Ex. 1 at ¶ 3-4; Ex. 2 at ¶ 3-4. At no time did either Ms. Cymbor or Ms. Thornton inform Plaintiff that she could utilize the EEO process at any time. See Ex 1; Ex. 2. Plaintiff acknowledged she was somewhat familiar with the EEO process because she served on a detail to that office at the OCC. Ex. 1 at ¶ 3.

At the October 11, 2005 meeting, Plaintiff informed Ms. Cymbor and Ms. Thornton that she did not believe OCC was discriminating against her. Ex. 1 at ¶ 5; Ex. 2 at ¶ 3. Plaintiff advised them that she believed utilizing the FAIR program was the better approach to resolve her workplace issue because she did not believe the actions in question were discriminatory. Id. Ms.

4

Cymbor and Ms. Thornton reiterated that if Plaintiff believed that she was being discriminated against, she had 45 days from the date of the alleged event to contact OCC WFAR staff to initiate EEO counseling.  Ex. 2 at ¶ 3.

Plaintiff decided to utilize the FAIR process to try to resolve her workplace issue.  On October 19, 2005, OCC WFAR sent a memorandum entitled "Notification of Mediation" to plaintiff.  <u>See</u> Exhibit 4, Notification of Mediation, ("Ex. 4").  The memorandum stated that on October 11, 2005, Plaintiff contacted WFAR to request mediation due to concerns she expressed with issues surrounding an alleged change in job duties after returning to work from maternity leave.  <u>Id</u>.  The memorandum further stated:

> Should mediation result in a resolution, the terms of the resolution will be reduced to writing in the form of a settlement agreement.  If resolution is not achieved, you may choose to pursue any administrative remedy, including initiating an informal complaint or grievance, provided that you initiate an action within appropriate time frames.

<u>Id</u>. at 1.

Attached to the memorandum was an Agreement to Utilize FAIR Mediation form.  <u>See</u> Exhibit 5, Agreement to Utilize FAIR Mediation, ("Ex. 5").  On October 20, 2005, Plaintiff signed the Agreement.  <u>Id</u>. at 3.  Section B of the first page of the Agreement, **Preserving Due Process Rights** (emphasis in original), provided:

> **FAIR mediations are not legal proceedings.**  Equally important, the mediators do not provide legal advice or legal counsel.  Also important, by agreeing to mediation you are <u>**not**</u> waiving your rights to proceed with the formal legal dispute resolution process, provided that you file a timely complaint/administrative or negotiated grievance. (Emphasis in original.)

<u>Id</u>. at 1.  Further, Plaintiff initialed the following paragraph of the agreement:

> I understand that if I believe I have been discriminated or retaliated against on the basis of race, color, religion, sex, national origin, age, disability, sexual orientation, parental status or genetic information, I must request EEO counseling within **45 calendar days** of

the date the matter alleged to be discriminatory or the date I became aware of the matter. (Emphasis in original)

Id. at 3.  By her initials and signature, Plaintiff acknowledged that she had read, understood, and agreed to the terms of the mediation agreement.  Id.

On March 7, 2006, Plaintiff filed a formal EEO complaint.  Exhibit 6, Complaint of Employment Discrimination, ("Ex. 6") at 1.  In the EEO complaint, Plaintiff alleged discrimination based on race (African-American), mental disability (depression), sex (female) on the basis of pregnancy and retaliation for her prior EEO activity.[1]  Ex. 6 at 2.  Plaintiff alleged that she was discriminated against because of her sex (female) on the basis of pregnancy when, upon returning to work from maternity leave on October 3, 2005, she was prevented from resuming her previous position and purportedly assigned to menial tasks.  Ex. 6 at 2.

By letter dated April 5, 2006, the Agency accepted for investigation Plaintiff's claims of discrimination based on race (African-American), mental disability (depression) and retaliation. See Exhibit 7, Memorandum regarding EEO claims accepted for investigation, ("Ex. 7").  The letter also noted that Plaintiff's discrimination claim based on sex (female) on the basis of pregnancy would not be investigated because Plaintiff "failed to timely initiate EEO counseling." Ex. 7 at 2.

By letter dated April 12, 2006, Plaintiff requested that the basis of mental disability be removed from her EEO complaint and that the basis of sex (female) be added to her claim of discrimination when she was not selected for the position of Program Analyst on December 2, 2005 and when she was assigned the position of HR Assistant on March 6, 2006.  Exhibit 8,

---

[1] Plaintiff filed an EEO complaint for her non-selection on December 2, 2005 for the position of Program Analyst, NB-0343-IV, under Vacancy Announcement Number MP-HQ-06-024; and when she was assigned to the position of HR Assistant, NB-203-IV, on March 6, 2006.  Exhibit 7 at 3.

Letter from Ms. White to Ms. Batts, ("Ex. 8") at 1.  On April 14, 2006, the Agency amended

Plaintiff's claims accepted for investigation, adding the basis of sex (female) specifically because

Plaintiff  "believe(d) sex discrimination was also a basis for [her] non-selection to the Program

Analyst position and reassignment to the HR assistant position. Exhibit 9,  Memorandum

regarding amended EEO claims, ("Ex. 9") at 1.

  In the OCC's April 5, 2006 letter, OCC further noted that Plaintiff initiated EEO

counseling on December 16, 2005.  Ex. 7 at 2.  The letter explained that Plaintiff chose to use the

Agency's FAIR process to address and resolve her workplace issue.  Id.  The letter further

explained that Plaintiff's decision to use the FAIR process to mediate the issue raised in her

claim did not result in the waiver of the statute of limitations for initiating EEO counseling under

the Equal Employment Opportunity Commission ("EEOC") regulations. Id.  Moreover, the

Agency noted that Plaintiff had initialed and signed the Agency's "Agreement to Utilize FAIR

Mediation" form on October 20, 2005, which clearly stipulated the time frames for initiating

EEO counseling, filing a union grievance, and filing an administrative grievance.  Id.

  The April 5, 2006 correspondence to Plaintiff indicated that, on or about October 11,

2005, OCC's WFAR EEO Specialist and its Complaints Manager[2] both advised Plaintiff of the

45 calendar-day time frame for initiating EEO counseling from the date of the discriminatory

event.  Ex. 2 at 2.  The memorandum noted that WFAR staff recalled that Plaintiff informed

them that she did not believe the event to be discriminatory and that she did not express an

intention to initiate EEO counseling.  Id.  The Agency concluded that Plaintiff was sufficiently

notified and understood her responsibility to request EEO counseling on her claim of

discrimination because of sex (female) on the basis of pregnancy within 45 calendar-days of the

---

[2] The WFAR EEO Specialist refers to Ms. Cymbor .  The Complaints Manager refers to Complaints Team Leader,
Sophia Thornton.

alleged discriminatory event.  <u>Id</u>.  Accordingly, the Agency dismissed this claim of

discrimination based on Plaintiff's failure to comply with the applicable time frames for

initiating EEO counseling contained in 29 C.F.R. §1614.105(a)(1) and §1614. <u>Id</u>.

## **ARGUMENT**

<u>Failure to Exhaust Administrative Remedies Results in Dismissal of Plaintiff's Claims</u>

"Dismissal results when a plaintiff fails to exhaust administrative remedies."  <u>Thrash v.

Library of Congress</u>, 2006 WL 463251 (D.C. Cir. 2006) (citing <u>Gillet v. King</u>, 931 F.Supp 9, 12-

13 (D.D.C. 1996) (dismissing plaintiff's Title VII claim for failure to exhaust administrative

remedies)).[3]

Compliance with the procedures and time lines for administrative review are mandatory.

"Complainants must timely exhaust these administrative remedies before bringing their claims to

court." <u>Bowden v. United States</u>, 106 F.3d 433, 437 (D.C. Cir. 1997); <u>Battle v. Rubin</u>, 121 F.

Supp. 2d 4, 7 (D.D.C. 2000) ("a party must timely file all applicable administrative complaints

and appeals in order to bring a claim in federal court"); <u>Williams v. Munoz</u>, 106 F. Supp. 2d 40,

---

[3] There exists some uncertainty within this District regarding whether a failure to properly exhaust administrative remedies is properly brought in a Rule 12(b)(1) motion, as a jurisdictional defect, or in a 12(b)(6) motion.  <u>Compare Mills v. Billington</u>, Civ. A. No 04-2205 (HHK), 2006 WL 1371683, at *2 (D.D.C. May 16, 2006) ("It is well-settled that a plaintiff's failure to exhaust her administrative remedies will deprive a district court of subject matter jurisdiction[.]"); <u>Williams v. Chertoff</u>, Civ. A. No. 05-0211 (RCL), 2005 WL 3200794, at *1 (D.D.C. Nov. 1, 2005) (same); *with Holmes v. PHI Serv. Co.,* 437 F. Supp. 2d. 110, 118-23 (D.D.C. 2006) (Walton, J.) (failure to timely exhaust is not a jurisdictional defect); <u>Walker v. Paulson</u>, Civ. A. No. 06-1115 (PLF), 2007 WL 1655879, at * 2 (D.D.C. June 7, 2007) (same); <u>see also Rann v. Chao</u>, 346 F.3d 192, 195 (D.C. Cir. 2003) (recognizing that prior D.C. Cir. decisions have reached conflicting answers as to whether a failure to exhaust is jurisdictional, but declining to decide the matter); <u>Mianegaz v. Hyatt Corp.</u>, 319 F. Supp. 2d 13, 17 (D.D.C. 2004) (Urbina, J.) (same); <u>Marcelus v. Corr. Corp. of Am. / Corr. Treatment Facility</u>, 540 F. Supp. 2d 231, n.4 (D.D.C. Mar. 31, 2008) (Leon, J.) (noting that "courts in this district continue to grapple with the appropriate standard for failure to exhaust," noting inconsistencies among courts in the D.C. Circuit.  However, much like in <u>Rann</u>, the distinction for purposes of this Motion is academic as dismissal is appropriate regardless of whether the Court relies on Rule 12(b)(1) or Rule 12(b)(6).

42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of a Title VII

action").  As the U.S. Supreme Court has stated, "strict adherence to the procedural requirements

specified by the legislature is the best guarantee of evenhanded administration of the law."

National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 108 (2002) (quoting

Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)).

 The reason for this result is clear. The exhaustion requirement "serves the important

purposes of giving the charged party notice of the claim and narrow[ing] the issues for prompt

adjudication and decision." Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 472, n. 325 (D.C.

Cir. 1976). Moreover, it "gives federal agencies an opportunity to handle matters internally

wherever possible" and "ensure(s) that the federal courts are burdened only when reasonably

necessary." Brown v. Marsh, 777 F.2d. 8, 14 (D. C. Cir 1985).

 Under the statutory framework a plaintiff must exhaust his or her administrative remedies

and the agency must be given the initial opportunity to resolve the issue internally. Lamont v.

Forman Bros. Inc., 410 F. Supp. 912, 917 (D.D.C. 1976). The agency is unable to carry out its

responsibilities under Title VII if it is not timely and fully informed of the basis of the complaint.

Furthermore, as the court observed in Milton v. Weinberger, 645 F.2d 1070, 1077 (D.C. Cir.

1981), the reasons for limiting claims to present violations is to "protect employers from the

burden of defending claims arising from employment decisions that are long past." Delaware

State College v. Ricks, 449 U.S. 261 (1980). Accordingly, the failure of plaintiff to avail himself

of these procedures results in dismissal of the claims. Brown v. General Services Administration,

425 U.S. 820, 832 (1976). Thus, summary judgment or dismissal is appropriate in cases where

the plaintiff has failed to exhaust administrative remedies.  Jensen v. Frank,

912 F.2d 517 (1st Cir. 1990); Saltz v. Lehman, 672 F.2d 207 (D.C. Cir. 1982); EEOC v.

Boorstin, 751 F.2d 1405 (D.C. Cir. 1985); DeMedina v. Reinhardt, 444 F. Supp. 573 (D.D.C. 1978).

The exhaustion requirement is not a mere technicality. The Court of Appeals has admonished that a district court should not "allow liberal interpretation of an administrative charge to permit a litigant to bypass the title VII administrative process." Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398 (3d Cir.1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). Moreover, under National Railroad, each incident of discrimination and each retaliatory adverse employment decision "constitutes a separate actionable 'unlawful employment practice,'" for which a timely administrative complaint must be filed. National Railroad 536 U.S. 101, 113.

Administrative Procedure

Under rulemaking authority delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established detailed procedures for the administrative resolution of discrimination complaints, including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission." Bowden, 106 F.3d 433, 437; 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity). The EEOC's regulations provide that "aggrieved" employees who allege they have been discriminated against must first consult an agency EEO counselor before filing a complaint of discrimination and must do so within 45 days of the "matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. §1614.105(a)(1).

As Plaintiff admits, the events giving rise to her claim of discrimination occurred upon her return to work from maternity leave on October 3, 2005, when she was allegedly prevented

from resuming her duties as HR Program Coordinator and assigned menial tasks instead.  Exhibit

10, Affidavit of Shauna White, ("Ex. 10") at 11.  Therefore, Plaintiff was required to initiate

EEO counseling on or before November 17, 2005.  However, Plaintiff did not initiate EEO

counseling until December 16, 2005, which was well beyond the limitations period.  Exhibit 11,

EEO Counseling Report, ("Ex. 11") at 1.  Hence, Plaintiff's failure to initiate EEO counseling

within the 45-day period requires dismissal of her claim.


Equitable Tolling

Plaintiff is incorrect in asserting that the Agency misled her or provided her with

inadequate notice with regard to the 45 calendar-day time frame for initiating EEO counseling

for her claim of alleged discrimination based on sex (female) on the basis of pregnancy.  Comp.

at ¶ 23.

In Baldwin County Welcome Center v. Brown, 466 U.S. 147 (1984) (*per curiam* ), the

Court stated that equitable tolling would be proper in "a case in which a claimant has received

inadequate notice, ... or where a motion for appointment of counsel is pending and equity would

justify tolling the statutory period until the motion is acted upon, ... or where the court has led the

plaintiff to believe that she ha[s] done everything required of her ... [or] where affirmative

misconduct on the part of a defendant lulled the plaintiff into inaction."  Id. at 151.  See Bowden

v. U.S., 106 F.3d 433, 438 (D.C. Cir. 1997) ("courts have excused parties, particularly those

acting *pro se,* who make diligent but technically defective efforts to act within a limitations

period, . . . . who were misled about the running of a limitations period, whether by an

adversary's actions, . . . by a government official's advice upon which they reasonably relied, . . .

or by inaccurate or ineffective notice from a government agency required to provide notice of the

limitations period," or "when complainants neither knew nor had reason to know about the limit") (citations omitted); see also Glenn v. Williams, 2006 WL 401816, slip op. at 10 (D.D.C. Feb 21, 2006) ("The four circumstances this Circuit has recognized in which a court may properly allow for equitable tolling in Title VII cases are where a claimant has received inadequate notice, where a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon, where the court has led the plaintiff to believe that she had done everything required of her, or where affirmative misconduct on the part of a defendant lulled the plaintiff into inaction.") (citing Mondy v. Secretary of the Army, 845 F.2d 1051, 1057 (D.C. Cir.1988)).

No evidence exists that the Agency misinformed Plaintiff about the limitations period or otherwise prevented her from asserting her rights. Contrary to Plaintiff's assertions, the evidence does not establish that the Agency informed Plaintiff that if she participated in mediation and the process was unsuccessful, she could initiate EEO counseling at any time following the 45 calendar-day time limitations period. Further, the declarations of Ms. Cymbor and Ms. Thornton establish that Plaintiff was informed that she could pursue the OCC's FAIR alternative dispute process or the EEO process. See Ex 1; Ex. 2. Ms. Cymbor explained to Plaintiff that the OCC's FAIR process mediated nondiscriminatory workplace issues and if Plaintiff believed that the Agency was discriminating against her, she could seek EEO counseling. See Ex. 1. Plaintiff was specifically advised by both Ms. Cymbor and Ms. Thornton that an EEO complaint would be considered timely only if Plaintiff requested EEO counseling within 45 calendar-days of a discriminatory event. See Ex 1; Ex. 2. At no time did either Ms. Cymbor or Ms. Thornton inform Plaintiff that she could utilize the EEO process at any time or that it was open

indefinitely.  Nor did they provide erroneous advice regarding the limitations period for initiating a claim of discrimination.

In addition to this meeting, OCC provided Plaintiff with additional notification of the limitations period in an Agreement to Utilize FAIR Mediation when Plaintiff chose to mediate her workplace issue.  See Ex. 5.  In executing that agreement, Plaintiff acknowledged her understanding of the time limitation for initiating an EEO discrimination claim.  Id.

Plaintiff's assertion that her contact with the WFAR office on October 11, 2005 should be deemed timely initial contact with an EEO counselor because she was misled into believing that she could pursue her EEO claim at a later time is equally without merit.  Ex. 6 at 5.  First, at the October 11, 2005 meeting, Plaintiff stated that she did not did not believe that her alleged change in job duties upon her return to work from maternity leave was motivated by discrimination.  See Ex 1; Ex. 2.  Plaintiff's election to pursue the OCC's FAIR mediation process on the same date reflects this belief.  Ex. 4 at 1; See Allen v. United States Postal Service, EEOC Request No. 05950933 (July 9, 1996) (It is well settled that a complainant/plaintiff satisfies the criterion of EEO counselor contact by contacting an agency official logically connected with the EEO process and by exhibiting an intent to begin the EEO process).  Subsequently, Plaintiff was clearly and unequivocally notified by the Agency of the 45 calendar-day limitations period for initiating an EEO discrimination claim on October 11, 2005, and acknowledged her understanding of the time limitation in the mediation agreement she executed on October 20, 2005. See Ex 1; Ex. 2; Ex. 5.

Thus, Plaintiff did not exhaust her administrative remedies regarding her claim of discrimination based on sex (female) on the basis of pregnancy and therefore her claim should properly be dismissed.

## **CONCLUSION**

For the reasons stated above, Defendant respectfully asks this Court to dismiss Plaintiff's

claims of sex (female) based on pregnancy

Dated: July 11, 2008

                                 Respectfully submitted,

                                 _/s/_____

                                 JEFFREY A. TAYLOR, D.C. Bar #498610

                                 United States Attorney

                                 _/s/_____

                                 RUDOLPH CONTRERAS, D.C. BAR #434122

                                 Assistant United States Attorney

                                 _/s/_____

                                 MEGAN M. WEIS

                                 Special Assistant U.S. Attorney

                                 United States Attorney's Office

                                 Civil Division

                                 555 4th Street, NW

                                 Washington, D.C. 20530

14

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE – 570
1801 L Street, NW
Suite 100
Washington, DC 20507

| | |
|---|---|
| Shauna I. White,       ) | EEOC No. 570-2007-00058X |
|           ) | |
| Complainant,     ) | |
|           ) | Agency No. 06-2231 |
| v.           ) | |
|           ) | |
| Henry M. Paulson, Jr., Secretary,   ) | AJ: Hon. Kathryn Brown |
| U.S. Department of the Treasury,   ) | |
|           ) | |
| Agency.      ) | |
|           ) | |

DECLARATION OF LAURIE CYMBOR
Office of the Comptroller of the Currency
Workplace Fairness and Equal Opportunity Division
Formerly the Workplace Fairness and Alternative Resolutions Division
Equal Employment Opportunity Specialist

1.      I, Laurie Cymbor, make the following declaration. My name is Laurie Cymbor, Equal Employment Opportunity (EEO) Specialist, NB 260, Band VI, Workplace Fairness and Equal Opportunity Division, Office of the Comptroller of the Currency. I have served as an EEO Specialist, beginning January 10, 1994 until on or about April 1998; and then again from November 2003 until the present time.

2.      On or about October 3, 2005, the first day of her return to work from maternity leave, Ms. White came to my office to discuss her job concerns and the fact that her personal possessions had been packed away while she was on maternity leave. Ms. White appeared emotionally distressed and relayed to me information regarding her personal life. Most of the conversation concerned Ms. White's personal situation. Due to her emotional state at that time, I suggested that she contact the Employee Assistance Program (EAP).

3.      On or about October 11, 2005, Ms. White visited me in my office to again discuss her workplace and personal concerns. I asked our Complaints Program Team Leader, Sophia Thornton, to join us. During Ms. Thornton's and my discussion with Ms. White, we explained our FAIR and EEO programs. Specifically, we explained that the FAIR program deals with nondiscriminatory concerns, such as communications issues, different

perceptions, personality differences, misinterpretations and misunderstandings. Ms. Thornton and I explained to Ms. White that there were no time frames for the FAIR program. We also informed her about the EEO process and the 45 calendar-day time frame for entering into the EEO pre-complaint process. This is a standard practice with our office. Ms. White acknowledged that she was somewhat familiar with the EEO process because she served on a detail in our office.

4.      At one point during our meeting on or about October 11, 2005, Ms. White inquired about whether she could change her mind if she opted to use FAIR, and, instead, pursue the EEO process. Ms. Thornton and I advised her that her complaint would be considered timely if she requested EEO counseling within 45 calendar days of the date she became aware of the alleged discriminatory event. We also reminded her that Saturdays and Sundays counted since the 45 days were calendar days and not business days. At no time did either Ms. Thornton or I tell Ms. White that she could come pursue the EEO process at any time or that it was always available. We did tell Ms. White that she could utilize the FAIR process at any time because the process does not have statutory time frames.

5.      Ms. White advised us that she wanted to think about the options, but that she believed the FAIR program was the better approach because she did not believe the actions taken by management were discriminatory.

6.      At no time throughout any of my discussions with Ms. White did I either encourage or discourage Ms. White from pursuing resolution of her issues through any particular process. At no time did I ever serve as an EEO counselor to Ms. White.

7.      On or about October 11, 2005, Ms. White opted to pursue resolution of her issues through FAIR by utilizing mediation. On October 20, 2005, Ms. White signed our standard Agreement to Utilize FAIR Mediation, and initialed the section which stipulates the time frame for timely raising EEO issues in the pre-complaint process.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on *February 21, 2007*

LAURIE CYMBOR
Workplace Fairness and Equal Opportunity Division
Equal Employment Opportunity Specialist

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE – 570
1801 L Street, NW
Suite 100
Washington, DC  20507

| | |
|---|---|
| Shauna I. White,<br><br>Complainant,<br><br>v.<br><br>Henry M. Paulson, Jr., Secretary,<br>U.S. Department of the Treasury,<br><br>Agency. | EEOC No. 570-2007-00058X<br><br>Agency No. 06-2231<br><br>AJ: Hon. Kathryn Brown |

DECLARATION OF SOPHIA THORNTON EAVES
Formerly of the Office of the Comptroller of the Currency
Workplace Fairness and Alternative Resolutions Division
Team Leader for the Complaints Team

1.     I, Sophia Thornton Eaves, am a former employee of the Office of the Comptroller

of the Currency, Workplace Fairness and Alternative Resolutions ("WFAR") Division.  I

worked in the WFAR Division from July 2005 to July 2006 as the Team Leader for the

Complaints Team.

2.     On or about October 11, 2005, Ms. Shauna White visited the WFAR Division to

discuss issues associated with her desk change.  During Ms. White's visit to the WFAR

Division on or about October 11, 2005, Ms. Cymbor asked me to join their meeting to

ensure she provided Ms. White appropriate information concerning the Fair Alternatives

and Innovative Resolutions (FAIR) Program and the EEO Process.  Ms. Cymbor

explained the FAIR process, which allows the parties to mediate their workplace issues.

Ms. Cymbor also explained to Ms. White that if she felt that she was being discriminated

against, she could seek EEO Counseling, the required first-step to filing an EEO Complaint.

3.    At the meeting with Ms. White and Ms. Cymbor, I reiterated to Ms. White that she must seek EEO counseling within 45 days of the alleged discriminatory event and that she could still use the FAIR program as long as she initiated EEO counseling, with the WFAR Division, within the 45-day time frame.  During the meeting, Ms. White commented that she didn't believe that she was being discriminated against.  I reiterated again that if she believed after the meeting that she was discriminated against, she had 45 days from the date of the alleged event to contact WFAR to initiate EEO counseling.

4.    To my knowledge, Ms. White used the FAIR process to attempt resolution of her workplace issue, and she signed the Agreement to Mediate Form which advised her, again, that she could initiate EEO Counseling within 45-days if she believed she was a victim of discrimination.

Comptroller of the Currency
Administrator of National Banks



# Fair Alternatives and Innovative Resolutions

"In all we do, we must respect each other, realizing we have individual needs, aspirations, and capabilities. As your Comptroller, I am responsible for leading the way to promote a workplace environment, which capitalizes on fairness, and one in which every employee is encouraged to work towards their maximum potential."

John D. Hawke, Jr.



*"Capitalizing on Fairness"*

250 E Street, SW
Washington, DC 20219-0001
Phone (202) 874-5360 • FAX (202) 874-5629

*For more information about FAIR or other Workplace Fairness programs, please call our office or visit our Web site at OCCnet.*

## FAIR Services Cover:

- Misinterpretations
- Different Perceptions
- Personality Differences
- Misunderstandings
- Multiple Organizational Conflicts

## FAIR Services Do Not Cover:

- Discrimination Complaints or Grievance Issues

The Workplace Fairness and Alternative Resolutions Division is responsible for administering the FAIR service program. The staff will:

- Educate the workforce on the FAIR service program through documentation and briefings.

- Use alternative dispute resolution techniques for FAIR services.

- Obtain neutral third party representatives.

- Schedule sessions.

## A New Informal Option

OCC now offers a new alternative dispute resolution (ADR) service entitled, "FAIR," Fair Alternatives and Innovative Resolutions, to promote a better understanding and open communication of workplace issues.

It is designed as a management and employee service for the resolution of issues.

FAIR promotes dialogue, emphasizes problem solving, stimulates negotiation, and suggests pathways toward mutual understanding.

## What Is the OCC's FAIR Service?

- The FAIR service is a voluntary informal process in which a trained and experienced professional serves as a neutral third party.

- The FAIR service is a collaborative approach that uses multiple ADR techniques that help to promote open dialogue.

- The FAIR service encourages parties to explore creative resolutions to reach a better understanding.

## How Does FAIR Work?

An OCC manager and/or employee contacts the Workplace Fairness and Alternative Resolutions (WFAR) Division to request the FAIR service.

A FAIR service representative obtains basic information pertaining to the issue and recommends the most appropriate ADR technique to use.

The FAIR service representative notifies all parties-in-dispute and requests their participation in the FAIR service program.

Upon their agreement to participate, the FAIR service representative assigns a neutral third party and schedules the session. The neutral third party will be obtained from Treasury or the Federal Shared Neutrals program, OCC-trained neutrals, or other neutral services. Most Shared Neutrals programs use certified mediators or facilitators.

The neutral third party will meet with the parties involved to conduct the session.

The neutral third party encourages parties to engage in open dialogue, helps them to build areas of agreement and narrow differences, offers ideas and suggestions, and aids them in exploring promising resolutions.

## What are the Benefits?

- *Voluntary* — Participation by voluntary agreement.

- *Informal* — Absence of complicated procedures, documentation, witness testimony under oath, investigations, and formal records.

- *Early Dialogue* — Early discussion before possible escalation of issues.

- *Neutrality* — A resolution is not imposed by the neutral third party.

- *Creative Resolutions* — Exploration of creative resolutions of issues.

- *Confidential* — Participant pledge of confidentiality at the beginning of the session.

- *Proactive Approach* — Prevention of possible formal issues.

- *Fast* — Completion of the session within a few hours.



# MEMORANDUM

Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

To: Shauna White

From: Linda Lynn Batts, Director
Workplace Fairness & Alternative Resolutions Division

Date: October 19, 2005

Subject: Notification of Mediation

On October 11, 2005, you contacted the Workplace Fairness and Alternative Resolutions (WFAR) Division to request mediation. You expressed concerns with issues surrounding the change to your job duties after returning to work from maternity leave.

Mediation, a form of alternative dispute resolution, is a voluntary, confidential and informal process designed to encourage parties to work together to resolve their dispute. During the mediation, a third party neutral guides the parties in discussing and attempting to resolve their differences.

Jesse Stiller has been assigned to mediate the session and Bernard Tomlin will serve as co-mediator. The mediation session will take place on Monday October 24, 2005, beginning at 8:30 a.m., in Conference Room 2073. You should allow at least five (5) to eight (8) consecutive hours for the mediation session.

Should mediation result in a resolution, the terms of the resolution will be reduced to writing in the form of a settlement agreement. If resolution is not achieved, you may choose to pursue any administrative remedy, including initiating an informal complaint or grievance, provided that you initiate an action within the appropriate time frames.

This communication, including attachments, may contain information that is non-public, confidential and protected by federal law. The unauthorized use, dissemination, distribution, or reproduction of this communication, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any rights under federal law.

2

Attached, for your information, is an information fact sheet describing the mediation process, along with the Agreement to Mediate form. Please sign and return the Agreement to Mediate
form to Laurie Cymbor, Equal Employment Opportunity Specialist, by noon on Thursday, October 20. In addition, she will contact you to explain the mediation process. Please do not hesitate to contact Laurie, or any member of our staff, for assistance. We may be reached at (202) 874-5360, (800) 723-9254, or TTY (800) 486-9228.

Attachments

This communication, including attachments, may contain information that is non-public, confidential and protected by federal law. The unauthorized use, dissemination, distribution, or reproduction of this communication, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any rights under federal law.

# AGREEMENT TO UTILIZE FAIR MEDIATION

## MEMORANDUM

October 19, 2005

To: Shauna White

Re: FAIR Mediation

As you know, mediation is a *voluntary, informal,* and *confidential* process to resolve disputes.

## A. Mediation Conference: Schedule and Expected Duration

Please read, sign, date and return this Agreement to Utilize FAIR Mediation. The mediation session is scheduled for Monday, October 24, 2005, beginning at 8:30 a.m., in Conference Room 2073. It is not unusual for the mediation session to last 5-8 hours.

## B. Preserving Due Process Rights

FAIR mediations are not legal proceedings. Equally important, the mediators do not provide legal advice or legal counsel. Also important, by agreeing to mediation you are *not* waiving your rights to proceed with the formal legal dispute resolution process, provided that you file a timely complaint/administrative or negotiated grievance.

## C. What is Mediation and How Does It Work?

Success in mediation depends on all participants being prepared to participate fully in the mediation process, including presenting documentation you feel is necessary to support your position.

1.    Phases of the Mediation Conference

The mediation conference begins with an opening statement regarding the mediators' roles as neutral third parties. The mediators are not advocates or legal representatives for or against either party. After the opening statement, the mediators will ask you to discuss your concerns and issues and the type of remedy you are seeking. The mediators will then give the responding party an opportunity to describe the dispute from her perspective. After the opening statements, the participants will enter into a joint discussion where the mediators might ask clarifying questions, and where potential solutions, if any, may be discussed.

At this point, the mediators may ask to meet privately (caucus) at least once with each participant. Information discussed in the caucus that is given to the mediators in confidence will not be shared with anyone else, subject to the limitations discussed below. Following the caucuses, the mediators may reconvene the joint session and determine if there is any area of agreement on any issue. If not, the parties will continue to negotiate, possibly re-caucusing until it is clear that a settlement is or is not going to emerge from this session

If a settlement is reached, the mediators will draft the terms of a settlement agreement, which are acceptable to all parties. For most agreements, management officials will have adequate delegations of authority to agree to the terms of the settlement. However, upon occasion, OCC management or legal personnel also will need to review and authorize a commitment to the settlement terms before they are effective.

A signed settlement agreement is intended to be binding on the parties. Accordingly, the agreement can generally be used as evidence in a later proceeding in which either of the parties alleges a breach of the agreement. It is also important that the participants understand that any written agreement reached during the course of the mediation could eventually become public record.

### 2.    Confidentiality

Confidentiality is a critical part of the process. **If you tell the mediators something in private and ask them to keep it confidential, the mediators are bound by law not to disclose this information voluntarily.** There are some obvious exceptions to this rule. For example, if you tell the mediators you plan to commit an act of fraud, waste, or abuse, or that you plan to commit a violent physical act, the mediators are required to share this information with appropriate authorities.

Remember that facts that were discoverable before the mediation session do not become confidential merely because they were presented during a mediation conference. It is only those things you say or write in confidence to the mediators during the mediation that will not be disclosed, unless one of the unusual exceptions discussed above applies. This means that the written agreement reached during mediation is not confidential – unless the parties agree to include a reasonable confidentiality clause.

The participants in the mediation session must agree that should the mediation not resolve the dispute, participants will not request information from the mediators in any future legal proceeding. If asked, participants must not provide information about what was discussed in the mediation session and should notify Linda Batts, OCC's WFAR Director. Ms. Batts will provide guidance about how to respond.

### D.    Conclusion

To summarize, mediation is an informal process designed to achieve a solution to the problem, which satisfies all parties and negates the need for further legal action on anyone's behalf aside from those steps that may be agreed to as part of a settlement agreement.

### E.    Signatures on Agreement to Mediate

This Agreement to Mediate must be signed and returned to the Workplace Fairness and Alternative Resolutions Office **within five (5) days of receipt**. A signed copy may be faxed to WFAR at 202-874-5629. Please send the Agreement to the attention of Tonya White. If you do not provide the WFAR Office with an original prior to the mediation, please bring the original to the mediation session.

Please review and initial each of the following paragraphs:

1.    _____ I understand that a claim of discrimination based upon race, color, religion, gender, national origin, age, retaliation, or disability may, at my discretion, be raised under the EEO administrative complaint process or through the negotiated grievance procedure if you are a member of the bargaining unit, but not both. I understand that I will have exercised this option at such time as I

timely file a formal complaint of discrimination with the Office of the Comptroller of the Currency or timely file a grievance in writing under the negotiated grievance process, whichever event occurs first. However, I understand I am not precluded from seeking EEO counseling as set forth in paragraph 2.

_____ I understand that if I believe I have been discriminated or retaliated against on the basis of race, color, religion, sex, national origin, age, disability, sexual orientation, parental status or genetic information, I must request EEO counseling within 45 calendar days of the date of the matter alleged to be discriminatory or the date I became aware of the matter.

_____ I understand that if I believe I have been discriminated or retaliated against on the basis of race, color, religion, sex, national origin, age, disability, marital status or political affiliation, I may file a grievance under the negotiated grievance process with an NTEU representative within 15 work days from the date of the matter alleged to be discriminatory.

2.    _____ I understand that if I am not a member of the bargaining unit and I believe that I have been discriminated or retaliated against on the basis of race, color, religion, sex, national origin, age, disability, sexual orientation, marital status or political affiliation, I may file an administrative grievance with my immediate supervisor within 15 workdays from the time I became aware of the act or situation about which I wish to grieve. If I choose to go through the EEO complaint process, I understand my administrative grievance will be held in abeyance until the discrimination complaint has been adjudicated.

By signing below, I acknowledge that I have read, understand and agree to this mediation agreement. (Please make a copy of this signed agreement and bring the copy with you to mediation.)

_____          10/20/05
Shauna White                        Date



| Form No. TDF 62-03.5 (01/03 Edition) | | FOR OFFICE USE ONLY |
|---|---|---|
| | | Workplace Fairness & Alternative Resolutions |
| | | CASE/COMPLAINT NUMBER: 06-2231 |
| **INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION WITH THE DEPARTMENT OF THE TREASURY** | | FILING DATE 3 / 9 / 06 |

## Part I Complainant Identification

**1. Name (Last, First, Middle Initial)**
WHITE, SHAUNA I

**2. Telephone/Fax (Include Area Code)**
Home 301 490 8602   Fax:
Work 202 874   Fax 301 433-9057

**3. Present Home Address** (You must notify the Department of any changes of address while complaint is pending, or your complaint may be dismissed)

3426 ANDREW CT. #101
Street Address
Laurel   MD   20724
City   State   Zip Code

**4. If you are a current or former employee of the Federal government, list your most recent title, series, and grade.**

HR PROGRAM COORDINATOR   201   IV
Title   Series   Grade

**5. Name and Address of Organization Where You Work (If a Treasury Employee)**

Bureau OFFICE OF THE COMPTROLLER OF THE CURRENCY
Business Unit WORKFORCE EFFECTIVENESS
Office and Organizational Component

Street Address 250 E STREET SW

City WASHINGTON   State DC   Zip Code 20219

**6. Employment Status in Relation to this Complaint:**

☐ Applicant  ☐ Probationary  ☒ Career/Career Conditional
☐ Former Employee   Date Left Treasury Employment ___/___/___
☐ Retired   Date of Retirement ___/___/___
☐ Other   Specify

**7. I certify that all of the statements made in this complaint are true, complete, and correct to the best of my knowledge and belief.**

Signature of Complainant or Attorney Representative   Date 3/7/06

## Part II Designation of Representative

**8.** You may represent yourself in this complaint or you may choose someone to represent you. Your representative does not have to be an attorney. You may change your designation of a representative at a later date, but you must notify the Department immediately in writing of any change, and you must include the same information requested in this Part.

"I hereby designate CRYSTA MADDOX (Please Print Name) to serve as my representative during the course of this complaint. I understand that my representative is authorized to act on my behalf."

**9. Representative's Mailing Address**

Comptroller of the Currency
Firm/Organization
250 E Street SW, 7-13
Street Address
Washington DC   20219
City   State   Zip Code

**10. Representative's Employer (If Federal Agency)**

Comptroller of the Currency

**11. Representative's Telephone/Fax (Include Area Code)**
202 874-4963   301 8 337 1717
Telephone   Fax

**12. Complainant's Signature   Date** 3/7/06

1

## Part III Alleged Discriminatory Actions

**13. Name and Address of Treasury Bureau that took the action at issue (if different than item 6.)**

_SEE #5_

Bureau                Office and Organizational Component

Street Address

City          State          Zip Code

**14. If your complaint involves nonselection for a position, please complete the following:**

_PROGRAM ANALYST 343    IV/V_
Position Title          Series          Grade

_MP:HQ-06-024    10, 2, 05_
Vacancy Announcement Number          Date Learned of Nonselection

**15.** (A) Describe the action taken against you that you believe was discriminatory; (B) Give the date when the action occurred, and the name of each person responsible for the action; (C) Describe how you were treated differently than other employees or applicants because of your race, color, religion, sex, national origin, age, disability, or in retaliation for your participation in the EEO process or opposition to alleged discriminatory practices; (D) Indicate what harm, if any, came to you in your work situation as a result of this action. (You may but are not required to attach extra sheets.) (E) If the basis of your complaint is your parental status, sexual orientation, or protected genetic information, use this form, but your complaint is not statutorily based and will follow a separate, parallel process.

_PLEASE SEE ATTACHED NARRATIVE STATEMENT_

**16. Mark below ONLY the bases you believe were relied on to take the actions described in #15.**

- [ ] Age (Date of Birth) _____
- [x] Race (State Race) _AFRICAN-AMERICAN_
- [ ] Color (State Color) _____
- [ ] Religion (State Religion) _____
- [x] Sex (Specify) _PREGNANCY_
- [ ] National Origin (Specify) _____

- [x] Physical or Mental Disability (Describe) _DEPRESSION_
- [x] Retaliation/Reprisal (Dates of Prior EEO Activity) _10/11/05_
- [ ] Sexual Orientation
- [ ] Parental Status
- [ ] Protected Genetic Information

**17. What remedial or corrective action are you seeking to resolve this matter?**

_SEE ATTACHED NARRATIVE STATEMENT    PAGE 6_

**18. If you wish to amend your complaint (or provide additional evidence), indicate the complaint case number of that complaint.**

_N/A_

## Part IV Contact

**EEO Counseling is not required if you are amending an existing open complaint. Complete items 19, 20, and 25 even if you did not contact a counselor.**

**19. When did the most recent discriminatory event occur?**

_3_ , _6_ , _06_
Month    Day    Year

**20. When did you first become aware of the alleged discrimination?**

_10_ , _5_ , _05_
Month    Day    Year

**21. When did you contact an EEO counselor?**

_10_ , _11_ , _05_
Month    Day    Year

**22. Did you discuss all actions raised in item 15 with an EEO counselor?** [ ] YES [x] NO _SEE Attached Narrative Statement Page 6_ (if no, explain on attached sheet)

**23. Name and telephone number of EEO counselor:**

_Laurie Gambino_          _303-874-7404_
Name          Telephone No.

**24. When did you receive your "Notice of Right to File"?**

_08_ , _21_ , _06_
Month    Day    Year

**25. On this same matter, have you filed a grievance or appeal under:**

| | YES | NO |
|---|---|---|
| Negotiated grievance procedure | [ ] | [x] |
| Agency grievance procedure | [ ] | [x] |
| MSPB appeal procedure | [ ] | [x] |

If you filed a grievance or appeal, provide date filed, case number, and present status.

**2**

NARRATIVE STATEMENT, SHAUNA I. WHITE
PART III: ALLEGED DISCRIMINATORY ACTIONS

**15(A)**

1. From Fall, 2004, until I left on maternity leave on May 25, 2005, I, as an HR Program Coordinator, Series 201, was in charge of the OCC's awards program. When I returned to work from 4 months maternity leave on October 3, 2005, I was prevented from resuming my job and was assigned menial tasks instead. This diminution of my job duties and responsibilities constitutes prohibited discrimination on the basis of sex under the Pregnancy Discrimination Act of 1978.

2. Non-selection for the position of Program Analyst, Series 343, NB IV-V, on December 2, 2005. The bases for this claim are race (African-American) and retaliation based on my participation in the EEO process, beginning with my initial contact with Laurie Cymbor, EEO Specialist, on October 11, 2005.

3. Assignment as HR Assistant, Series 203, NB IV, effective March 6, 2006. This action, which is a demotion in all but pay grade from my current position as HR Specialist, Series 203, NB IV, is based on race, and in obvious retaliation for my participation in the EEO system based on my initial contact of October 11, 2005, my follow-up contact on December 15, 2005, and, in particular, for my refusal to accept the agency's inadequate offer of settlement tendered on February 14, 2006.

**15(B)**

1. I learned that my job duties had been taken away from me upon my return from maternity leave on October 3, 2005. The person principally responsible for this action is Ms. Cindy Petitt, Deputy Comptroller for Workforce Effectiveness. I reserve the right to name other individuals following the EEO investigatory process.

(I am aware that initial contact with an EEO specialist must, under 29 C.F.R. § 1614.105(a)(1), occur within 45 days of the matter alleged to be discriminatory. I also am aware that, under 29 C.F.R. § 1614.105(a)(2), this period shall be extended, either by the agency or by the Commission, when an individual shows either that she was not notified of the time limits or, as here, she was misled by the agency.

I first sought counseling when I met with Laurie Cymbor on October 11, 2005, obviously well within the 45-day time limit to initiate counseling. According to my notes of the conversation, which I prepared the same day, Ms. Cymbor advised me that I had two choices: file an informal EEO complaint within 45 days, or participate in the agency's ADR program. Ms. Cymbor advised me that the EEO complaint process is "longer, more adversarial and that I must be sure." More importantly, she misled me about the 45-day time limit for filing an informal complaint. Ms. Cymbor told me that if I "go FAIR I still have the option to change and go EEO." (Emphasis added.) Ms. Cymbor also told me that if, through the ADR process, I discover facts, which reinforce my conclusion that I was discriminated against, "it can be recognized later." (Emphasis added.) Finally, Ms. Cymbor asked if I "really believed they took me out of my job because I was away on maternity leave," because an EEO complaint "is always open if the mediation does not" work. (Emphasis added.) I chose to participate in the agency's ADR program, which, unfortunately, was not successful.

NARRATIVE STATEMENT, SHAUNA I. WHITE
PART III: ALLEGED DISCRIMINATORY ACTIONS

Now, adding insult to injury, the EEO counselor who misled me, Ms. Cymbor, told me on January 24, 2006, that she "thinks" I may have missed my deadline for filing. The agency must reject this post-hoc rationalization for her own mistake. On December 15, 2005, following the conclusion of ADR, speaking with Ms. Cymbor once again, I reiterated that I would be filing an informal EEO complaint based on the OCC's preventing me from resuming my job duties after my return from maternity leave. I also informed her, for the first time, that I am contesting my non-selection based on the OCC's failure to select me for the Program Analyst, Series 343, NB IV-V position, which, in effect, is my old job.

When an agency gives a potential complainant errant advice -- intentional or not – about starting the EEO process, this constitutes sufficient grounds for waiving the time period for counselor contact. *Lewis v. Secretary of Treasury*, 01981738 (1999), *Porter v. Secretary of Treasury*, 01976234 (1999), and *Whitley v. Postmaster General*, 01913883 (1991) (EEO counselor advised complainant would have the right to bring the claim at a later date). *Porter* is directly on point:

> However, what the agency is in effect asserting is that although appellant made timely contact, she did not evidence an intent to pursue the EEO process until September 6, 1995, which was beyond the requisite 45-day limitations period. The Commission has held that a complainant satisfies the criterion of Counselor contact by contacting an agency official logically connected with the EEO process and by exhibiting an intent to begin the EEO process. *See Allen v. U.S. Postal Service*, No. 05950933 (July 8, 1996); *Floyd v. National Guard Bureau*, No. 05890086 (June 22, 1989); *Dumaguindin v. Department of the Navy*, No. 01954218 (April 1, 1996) (emphasis added). We find that appellant intended to pursue the non-selection issue in January 1995. However, she did not do so until September 1995, approximately six months later, because she relied on the EEO Counselor's representation in January 1995, that she could pursue the allegation in the future. The Commission has held that agency actions that mislead an individual concerning his or her EEO rights will toll the limitations period. *See Herrera v. U.S. Postal Service*, EEOC Request No. 05891351 (Sept. 28, 1989) (the Commission found that it would allow the "tolling of time requirements when an agency lulls a complainant into taking no action or actively misleads or prevents a complainant from asserting his rights"); *Ong v. Department of the Army*, EEOC Request No. 05880290 (Aug. 8, 1988).

The same thing happened here. In *Porter*, the Commission excused a six-month delay. By contrast, my reliance on Ms. Cymbor's advice caused me to miss the 45-day time limit by approximately three weeks. The agency should, under the circumstances, toll the 45-day limitations period and treat my October 11, 2005 and December 15, 2005 EEO counselor contacts as sufficient to satisfy the criterion for counselor contact.)

2. I learned that I had not been selected for the position of Program Analyst, Series 343, NB IV-V, on December 2, 2005. To the best of my knowledge and belief, the person principally responsible for this action is Ms. Cindy Petitt, Deputy Comptroller for Workforce Effectiveness. Others, including the interview panel members Beth Elliott and Purcell Clark,

2

4

NARRATIVE STATEMENT, SHAUNA I. WHITE
PART III: ALLEGED DISCRIMINATORY ACTIONS

also may be responsible. Due to the internal political issues inherent in these related personnel actions, I would be surprised if Ms. Petitt did not consult other high-level officials.

3. I learned on February 27, 2006 that I would be assigned, against my will, to the position of HR Assistant, Series 203, NB IV, effective March 6, 2006.

**15(C).**

1. According to the EEOC, the basic principle of the Pregnancy Discrimination Act is that women affected by pregnancy must be treated the same as other employees on the basis of their ability or inability to work. "If other employees who take disability leave are entitled to get their jobs back when they are able to work again, so are women who have been unable to work because of pregnancy." 29 C.F.R. Part 1604 (Appendix). The OCC is in violation of this provision because when I reported for work in October, 2005, following my maternity leave, Cindy Pettit told me that I was "not a good fit" for my position and that my replacement, Teresa Hockaday, who I trained for this position before leaving, was doing well in the position, my position. Ms. Pettit told me that "it was a mistake" to have placed me in my position. Ms. Pettit tried to talk me into accepting a position as an HR assistant, Series 203, with less opportunity for promotion. I also visited with Ms. Hockaday, who, as I mentioned, I had trained to fill in for me during my absence. Teresa told me that "they told me not to give you any of the work that I'm doing." If other OCC employees customarily are treated this way, the burden is on the OCC to prove it. *See Byrd v. Lakeshore Hospital*, 30 F.3d 1380 (11th Cir. 1994). The OCC's conduct is eerily similar to that in *Greene v. Smithsonian Institution*, 01954696 (1996), where the Commission reversed an agency decision to dismiss certain of complainant's allegations. In that case, appellant's duties were removed, and she was replaced by an employee whom the appellant had trained.

Another troubling example of how I was treated differently – based on pregnancy -- occurred early in 2004 when I informed my former supervisor, Mary Santiago, that I was pregnant. Her reaction shocked me: "I brought you up here. We have all these things to do. And this is how you thank me. It's not going to work for me." These comments show that the agency has engaged in a pattern of conduct to affect the terms and conditions of my employment. This pattern of discrimination was initially based on sex (pregnancy), and, later, in my non-selection for the position of Program Analyst, Series 343, NB IV-V, on race and on reprisal for EEO activity as well. *See Foster v. Secretary of Navy*, 01962504 (1998).

2. I was treated differently than other employees/applicants when I was not selected for the position of Program Analyst, Series 343, NB IV-V. As noted, this position essentially is the same job I was performing at the time I left on maternity leave in May, 2005. I am alleging I was treated differently based on my race (African-American), and in retaliation for my participation in the EEO process on October 11, 2005, when I made contact with Ms. Laurie Cymbor to protest the fact that when I returned to work, my job duties had been taken away from me. The selectee, Teresa Hockaday, is white. "In the federal sector, once a federal employee initiates contact with an EEO counselor, (s)he is engaging in 'participation.'" EEOC Compliance Manual, Section 8, at 9 (May 20, 1998). Another factor -- disparity in educational background -- highlights the agency's discriminatory treatment in selecting Ms. Hockaday over me for my old position. I earned a Bachelor of Science Degree

NARRATIVE STATEMENT, SHAUNA I. WHITE
PART III: ALLEGED DISCRIMINATORY ACTIONS

in Human Resources Management from Florida State University, Tallahassee, Florida in 1998. To my knowledge, Ms. Hockaday does not have an undergraduate degree.

3. I was treated differently when I was assigned, against my will, to the position of HR Assistant, Series 203, NB IV, effective March 6, 2006, based on race, and in retaliation for my refusal to accept the wholly inadequate settlement proposal which the agency offered last month. The retaliation is obvious: in response to my refusal to accept their offer, the agency – three weeks later – placed me in a position at the level – HR Assistant – which I specifically refused to accept.

15(D)

1. The harm which came to me as a result of the agency's discriminatory action was the removal of my job duties and my consequent inability to return to the job I had been performing extremely well prior to my departure on maternity leave. According to my performance appraisal dated November 28, 2005 (attached as Exhibit 1), I performed my responsibilities in an exemplary manner, providing, among other things, "exceptional customer service." In the midst of Comptroller's Hawke's departure, I "orchestrate[d] the order and delivery [of awards] within a shorter time frame . . . with no errors." When I left on maternity leave on May 25, 2005, I was managing the agency's awards program.

All of a sudden, upon my return, Ms. Pettit informed me, for the very first time, that I was "not a good fit" for my position and that my replacement, Ms. Hockaday, whom I had trained for the position, was better suited. Neither my boss, Mary Santiago, nor her replacement, Beth Elliott, had ever informed me of any shortcomings in the performance of my job duties, which, prior to May 25, 2005, consisted of, among other things: (1) working closely with management and vendors – often within short time frames -- to ensure the correct ordering and delivery of annual honorary awards; (2) viewing reports in order to prepare LOS orders for monthly anniversaries; (3) coordination of external purchases, ensuring that all goods were received and on time before submitting approval for payment; (4) review of applicable federal regulations to ensure that only eligible employees receive awards; and (5) completion of a 40-hour course on the duties and responsibilities of Contracting Officer's Training Representative ("COTR") in order to function in the position of contracting officer's representative for all of the agency's awards contracts. (Since my return on October 3, 2005, none of the duties which I have been permitted to perform has allowed me to use the skills I acquired in the COTR training.) Please see Exhibit 2, attached, for a list of my job duties and responsibilities, prior to my departure on maternity leave.

Ms. Pettit urged me to take an HR assistant position, which would have provided me with less important and more mundane duties, less visibility, and less opportunity for promotion. I told her that her proposal represented a demotion. Although the agency has not reduced my level of compensation, it has, in effect, demoted me because it has – without warning – refused to allow me to return to the job I had when I left on maternity leave, and placed me in the embarrassing and demeaning position of having to go around begging for work. As noted, when I approached my "temporary" replacement, Ms. Hockaday, she informed me that "they told me not to give you any of the work that I'm doing." Much of the work I have done since my return has been menial.

4

6

NARRATIVE STATEMENT, SHAUNA I. WHITE
PART III: ALLEGED DISCRIMINATORY ACTIONS

Moreover, in 2004, when, with Mary Santiago's encouragement, I transferred – as an HR Specialist Series 201 -- from Continuing Education to Human Resources, Mary told me that in one year I would become eligible for a promotion to pay band NB V. My discriminatory treatment at the hands of the agency following my return from maternity leave, while not cutting my salary, clearly has obviated any possibility of my promotion to band V in the immediate future.

Finally, the agency's intentional discriminatory conduct in removing me from my job while I was on maternity leave has caused me to suffer emotional harm which qualifies me for compensatory damages under the Civil Rights Act of 1991. The agency's consistent pattern of conduct since my return from maternity leave has caused me a great deal of mental anguish, stress, and depression, for which I am being treated by a professional counselor. In fact, I nearly suffered a nervous breakdown in December.

I began treatment for depression following the birth of my son in May, 2005. I began taking Zoloft during that time. By the time I returned to work in October, 2005, I was feeling much better and the depression had lifted. I'm feeling much worse now in terms of depression; the agency's campaign to discredit me has taken its toll. I'm thinking, in particular, of Ms. Petitt's insulting comments and refusal to assign me any work. Just two weeks ago, at the conclusion of our unsuccessful efforts at negotiating a settlement of this matter, Ms. Petitt threatened that if I file a formal EEO complaint, "who do you think they are going to believe." This statement represents the culmination of a 5-month campaign on her part to humiliate me into surrendering, voluntarily, the position I was performing successfully when I left on maternity leave. It is unprofessional and degrading behavior for a Deputy Comptroller to inform a loyal and proficient employee – out of the blue – on her first day back from maternity leave that she is "not fit' to perform her job and that she "shouldn't have expected to resume the position." As noted, this conduct placed me in the humiliating position of having to beg for work; my replacement was instructed not to allow me to help her or to give me any work. Nor did it help my state of mind when Ms. Petitt told me, gratuitously, that I was never in consideration to regain my old position once it was posted in November, 2005.

2. The harm resulting from my discriminatory and retaliatory non-selection for the position of Program Analyst, Series 343, NB IV-V, is that I have been unable to resume the tasks I was performing prior to my departure on maternity leave on May 25, 2005. This non-selection has hindered, if not destroyed, my ability to be promoted to a band V.

3. The harm resulting from my assignment to the HR Assistant position effective March 6, 2006 is that it represents a constructive demotion. Although my pay grade has not been reduced, my opportunity for promotion to pay band V has been eliminated. Additionally, my feelings of self worth and pride in my professional accomplishments have been destroyed by this reassignment to an assistant position. The harm is self-evident; I am no longer an HR Specialist but a mere HR Assistant, the position I left several years ago to become an HR Specialist, a more prestigious position with an opportunity for promotion. This step is embarrassing and in obvious retaliation for my refusal to accept the agency's settlement offer.

5

NARRATIVE STATEMENT, SHAUNA I. WHITE
PART III: ALLEGED DISCRIMINATORY ACTIONS

17.

    1. Restoration to a position equivalent to Program Analyst, Series 343, NB-IV-V. The position must have the same promotion potential. My understanding is that the selectee whom I trained, Ms. Hockaday, can be promoted to a band V at any time.

    2. Compensatory damages based on emotional distress resulting from the agency's actions.

    3. Any and all other relief to which I am legally entitled.

22. I discussed the first two items raised in item 15 — discrimination based on sex (pregnancy), and non-selection based on race and retaliation -- with an EEO counselor. As for the latest discriminatory and retaliatory behavior, my assignment to the HR Assistant position, effective March 6, 2006. I was only just notified that my series and title would be changed (Monday February 27, 2006), and I had already been issued the Notice of Right to File. Therefore, I did not have the opportunity to meet with the counselor.



Comptroller of the Currency
Administrator of National Banks

Washington, DC 20219

April 5, 2006

Shauna White
3426 Andrew Court, #101
Laurel, MD 20724

Subject: Complaint of Shauna I. White and John W. Snow, Secretary of the Treasury
         TD Case Number:  06-2231

Dear Ms. White:

This letter refers to the subject complaint of discrimination filed on March 7, 2006.
Based on our review of the formal complaint, the EEO Counseling Report, and
information provided by the EEO Specialist and Complaints Manager of the Workplace
Fairness and Alternative Resolutions (WFAR) Division, Office of the Comptroller of the
Currency, a portion of your complaint has been accepted for investigation.  The scope
of the investigation will include the following claims only:

Claims Accepted for Investigation

    Whether the complainant was discriminated against on the basis of her race
    (African American), mental disability (depression), and retaliation, when, on
    December 2, 2005,[1] she was not selected for the position of Program Analyst,
    NB-0343-IV, announced under vacancy announcement number MP-HQ-06-024;
    and when, on March 6, 2006, she was assigned to the position of HR Assistant,
    NB-203-IV.

If you do not agree with this articulation of the claims accepted for investigation, you
must provide us with sufficient reasons, in writing, within seven (7) calendar days of
receipt of this letter.  Please be clear and concise in your response.  If no response is
received, I will assume that you agree with the articulated claims and will proceed with
the investigation.

---

[1] A discrepancy exists between the December 2, 2005, selection date documented in the complaint and the Merit
Promotion Certificate documenting a selection was made on December 5, 2005.

**16**

In your March 7, 2006, complaint, you also alleged that your were discriminated against because of your sex (female) on the basis of pregnancy when, upon returning to work from maternity leave on October 3, 2005, you were prevented from resuming your previous position and assigned menial tasks. The agency finds that you failed to timely initiate EEO counseling. You initiated EEO counseling on December 16, 2005. To address and resolve your workplace issue, you chose to use the agency's Fair Alternatives and Innovative Resolutions (FAIR) process. Your decision to use the FAIR process to engage in mediation of the issues named in this claim does not result in a waiver of the statute of limitations for initiating EEO counseling under the Equal Employment Opportunity Commission regulations. On October 20, 2005, you signed the agency's "Agreement to Utilize FAIR Mediation" form, which clearly stipulates the specific timeframes for initiating EEO counseling, filing a union grievance and filing an administrative grievance. Your initials and signature on the form document that you were notified and understood the timeframes for initiating EEO counseling.

Furthermore, on or about October 11, 2005, WFAR's EEO Specialist and Complaints Manager both advised you of the 45 calendar-day timeframe for initiating EEO counseling from the date of the discriminatory event. They recall you informing them that you did not believe the event was discriminatory and you did not express an intention to initiate EEO counseling. I conclude that you were sufficiently notified and understood your responsibility to request EEO counseling on this claim within 45 calendar days of the alleged discriminatory event. Therefore, this claim is dismissed for failure to comply with the applicable timeframes contained in 29 CFR §1614.105(a)(1) and §1614.107(2).

In accordance with 29 CFR §1614.107(b), this claim will not be investigated. A copy of this letter and any supporting documentation will be placed in the complaint file. This decision is reviewable by an Administrative Judge if you request a hearing on the remainder of the complaint. If you request a final decision from the agency without a hearing, the agency will issue a decision addressing all claims in the complaint, including the rationale for dismissing claims, and its finding on the remainder of the complaint. This dismissal may not be appealed until a final action is taken on the remainder of the complaint.

Investigation of Accepted Claims

An EEO investigator will be assigned to thoroughly investigate all aspects of the claims accepted for processing. The investigator has the authority to administer oaths and to require employees to furnish affidavits under oath or affirmation without a promise of confidentiality or, alternatively, by written statements under penalty of perjury. You have the responsibility to cooperate with the investigator by timely scheduling an appointment, meeting with the investigator and providing necessary written statements. Failure to do so may result in the dismissal of the complaint for failure to cooperate.

**17**

Any affidavit, written statement, or documentary evidence submitted to the investigator is subject to prohibitions against improper disclosures. All parties who provide statements or documentary evidence bear the responsibility to ensure that the submissions are properly sanitized, and should consult with the agency's disclosure officials if there are any questions concerning what material would constitute disclosure.

In accordance with 29 CFR §1614.603 of the regulations, the parties must make reasonable efforts to voluntarily settle the complaint throughout the process. The terms of any settlement agreement will be reduced to writing, and you will be given a copy.

The investigation must be completed within 180 calendar days of the date of your filing of the complaint, unless you and the agency agree, in writing, to extend the time period up to an additional 90 days. Upon completion of the investigation, you will receive a copy of the investigative file and an election form on which you may elect one of the following options: 1) a hearing and decision by and EEOC Administrative Judge; 2) a final decision by the Department of the Treasury without a hearing; or 3) withdrawal of the complaint. As described on page two (2), it is at this point in the process that a final decision will be made on the claim dismissed for untimeliness.

<u>Request for Hearing</u>

You may request a hearing from an Administrative Judge at any time after 180 days from the date of the original complaint or within 30 calendars days of receipt of the investigative file and notice of election. Should you request a hearing on your complaint, your request should be sent to:

> District Director
> Equal Employment Opportunity Commission
> Washington Field Office
> 1801 L Street, N.W. Suite 100
> Washington, DC 20507

In accordance with 29 CFR §1614.108(g), you must send a copy of your request for a hearing to:

> Director, Workplace Fairness and Alternative Resolutions
> Office of the Comptroller of the Currency
> 250 E Street, S.W., MS 2-6
> Washington, D.C 20219

-3-

**18**

Appeals/Litigation

If you are dissatisfied with the Department's final decision or final order, after a hearing or without a hearing, you may file an appeal with the EEOC's Office of Federal Operations or file a civil action in federal district court within 90 calendar days of your receipt of the decision. Appeals must be faxed to (202) 663-7022 or sent to:

Equal Employment Opportunity Commission **(Mailing Address)**
Office of Federal Operations
P.O. Box 19848
Washington, DC 20037

Equal Employment Opportunity Commission **(Hand Delivered)**
Office of Federal Operations
Appellate Review Programs
1801 L Street, NW
Washington D.C.

If you have any further questions regarding the processing of your complaint, please contact Irene Sandate, EEO Manager, at (202) 874-5360.

Sincerely,

Linda Lynn Batts
Director
Workplace Fairness and Alternative Resolutions
Office of the Comptroller of the Currency

cc: Crystal Maddox, Representative

-4-

19

Shauna I. White
3426 Andrew Court, #101
Laurel, Maryland 20724

April 12, 2006

Ms. Linda Lynn Batts
Director
Workplace Fairness and Alternative Resolutions
Office of the Comptroller of the Currency
250 E Street, S.W., 2d Floor
Washington, D.C. 20219

Dear Ms. Batts:

Thank you for this opportunity to comment on the "Claims Accepted for Investigation." I have two requests. First, in response to question 15(d) of my Individual Complaint of Employment Discrimination, filed March 7, 2006 ("Formal Complaint"), I indicated my eligibility for compensatory damages under the Civil Rights Act of 1991, as a result of the discriminatory practices noted. Consistent with that determination, I checked the box "Physical or Mental Disability" in response to question 16. I do not contend, however, that my discriminatory non-selection for the position of Program Analyst, NB-0343-IV, or my assignment, on March 6, 2006, to the position of HR Assistant, NB-203-IV, was on the basis of mental disability (depression). Please remove that designation from the Claim.

Second, please refer to the Formal Complaint, question 16. That question asks for the "bases you believe were relied on to take the actions described in #15." I checked the box marked "Sex" because I believe the agency actions I have described in my narrative response to question 15 were based, in large part, on sex discrimination. Moreover, the events I described in the claim which you have dismissed are, necessarily, inextricably intertwined with my non-selection for the position of Program Analyst, NB-0343-IV. It would be prejudicial to my rights to exclude from the accepted claim my contention that sex discrimination occurred here. I suggest, therefore, that the "Claims Accepted for Investigation" be revised as follows:

Whether the complainant was discriminated against on the basis of her race (African-American), sex (female), and retaliation, when, on December 2, 2005, she was not selected for the position of Program analyst, NB-0343-IV, announced under vacancy announcement number MP-HQ-06-024; and when, on March 6, 2006, she was assigned to the position of HR Assistant, NB-203-IV.

**20**

Thank you very much for your consideration.

Sincerely,

Shauna I. White

**21**



**Comptroller of the Currency**
**Administrator of National Banks**

Washington, DC 20219

April 14, 2006

Shauna White
3426 Andrew Court, #101
Laurel, MD 20724

Subject:  Complaint of Shauna I. White and John W. Snow, Secretary of the Treasury
          TD Case Number:  06-2231

Dear Ms. White:

I have reviewed your letter of April 12, 2006, and have considered your request to remove the basis of mental disability and add the basis sex (female) to your claims of discrimination. Based on your statement that you were not discriminated against on the basis of a mental disability in the non-selection for the position of Program Analyst, NB-0343-IV, or your reassignment to the position of HR Assistant, NB-203-IV, on March 6, 2006, I will remove the basis of mental disability from the claims accepted for investigation. I will add the basis of sex (female) because you believe sex discrimination was also a basis for your non-selection to the Program Analyst position and reassignment to the HR Assistant position.

The amended claims accepted for investigation are as follows:

> Whether the complainant was discriminated against on the basis of her race, (African American), sex (female) and retaliation, when on December 2, 2005, she was not selected for the position of Program Analyst, NB-0343-IV, announced under vacancy announcement number MP-HQ-06-024; and when, on March 6, 2006, she was assigned to the position of HR Assistant, NB-203-IV.

During each stage of the EEO complaint process, parties are encouraged to explore opportunities to resolve the complaint. Mediation, a form of alternative dispute resolution, is available to assist the parties in reaching a mutually acceptable resolution. If you are interested in using mediation to resolve your complaint, please contact the Workplace Fairness and Alternative Resolutions Division.

This communication, including attachments, may contain information that is non-public, confidential and protected by federal law. The unauthorized use, dissemination, distribution, or reproduction of this communication, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient's is not a waiver of any rights under federal law.

A contract investigator has been assigned to conduct the investigation of the claims accepted for processing and will contact you in the very near future. If you have additional questions regarding the processing of your complaint, you may contact Irene Sandate, EEO Manager, at (202) 874-5360.

Sincerely,

Linda Lynn Batts
Director
Workplace Fairness and Alternative Resolutions
Office of the Comptroller of the Currency

cc: Crystal Maddox, Representative
    Rita Arendal, Senior Attorney, Administrative and Internal Law
    Cindy Petitt, Deputy Comptroller, Workforce Effectiveness
    Beth Elliot, Director, Human Resources Solutions

-2-

This communication, including attachments, may contain information that is non-public, confidential and protected by federal law. The unauthorized use, dissemination, distribution, or reproduction of this communication, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient's is not a waiver of any rights under federal law.

23

**Affidavit of Shauna White**
**Office of the Comptroller of the Currency**
**Case Number TD 06-2231**

I, Shauna White, make the following statement under oath or affirmation:

QUESTION:  For the record, what is your name, job title, series, grade and organizational unit?
My name is Shauna Irene White.  I am an HR Assistant, 203-NB-04.  My organizational unit is Workforce Effectiveness HR Solutions

QUESTION:  For the record, what is your race and gender?
African-American, female

QUESTION:  How long have you worked with the federal government (with dates)?
Since May 2000

QUESTION:  How long have you worked for the Office of the Comptroller of the Currency (with dates)?
May 2000

QUESTION:  How long have you held your current position (with dates)?
Since February 2006

QUESTION:  Who is your first line supervisor?
Beth Elliott-Director EPP&I / HR Solutions

QUESTION:  Who is your second line supervisor?
Cindy Petitt-Deputy Comptroller for Workforce Effectiveness

QUESTION:  Who were your first and second line supervisors during the period relevant to your complaint?
My first line supervisor was Mary Santiago-Director HR Solutions, and my second line supervisor was Cindy Petitt

QUESTION:  Was there a vacancy for the position of Program Analyst NB-0343-IV?
Yes

QUESTION:  Did you apply for the position?
Yes

QUESTION:  Were you certified as being qualified?
Yes

**24**

Affidavit of Shauna White
TD 06-2231
Page 2 of 15

QUESTION:  Who was selected for the position?

Teresa Hockaday – The rotational employee former secretary for Mid-sized credit Card Banks who was selected and whom I trained to substitute for me while on maternity leave.

QUESTION:  What, if you know, was the selectee's race and gender?

White Female

QUESTION:  Do you know who made the selection?  If yes, please provide their name, title and organizational unit.

Beth Elliott- WFE & Purcell Clark – WFE were both part of the interview panel. I believe Beth Elliott made the selection

QUESTION:  How did the person(s) making the selection know of your race and gender?

They interviewed me in person.

QUESTION:  Why do you contend you should have been selected for the position of Program Analyst?

Prior to maternity leave I was responsible for the majority of the job functions that were combined to create the duties of the new position of Program Analyst.  In May of 2005 the awards program and purchasing mementos for the OCC was a part of the duties of Program Coordinator, along with various other administrative tasks such as time entry, managing the Directors calendar, procurement of office supplies for HR Solutions and coordinating/conducting bi-weekly New Hire Orientation.

In preparation for my extended approved maternity leave my previous director Mary Santiago asked that I complete various tasks, in order to make for a smooth transition to my temporary replacement rotational employee Teresa Hockaday.  In addition, she discussed her plan to add temporary contracts to my duties and exclude the various mundane administrative tasks to give me more time to focus on the core of the job.  Director Santiago further elaborated that adding more high profile duties such as the temporary contracts it would enable her to propose the job then be upgraded to a band VI-V rather than the IV that it was previous to my leave.

Upon completion of these tasks to it was my impression that the job was to be upgraded, based on director Santiago's statements of being able to justify the upgrade if the duties merit.  I left a month early unexpectedly due to the early arrival of my son, however, I had initiated the transition of the job and prepared training materials and held training sessions for Ms Hockaday and other staff from the Denver Service Center.  I addition, I prepared and left a book with directions and detailed mapping processes of the duties outlined in my job

I believe I should have been selected for the position because I have more work experience and education than the person selected.  I have more experience performing the duties required of the position and I have a bachelor's degree in Human Resources.  I served as the coordinator for the awards program for over a year.  I had COTR training and experience handling the duties of the COTR for

**25**

Affidavit of Shauna White
TD 06-2231
Page 3 of 15

over a year where Ms Hockaday was sent to training a week after my return to duty from maternity leave. Additionally, Mary Santiago promised me the upgraded position when she designated the tasks I needed to complete prior to taking my leave, tasks that I did complete.

QUESTION: Were you provided reasons for your non-selection? If yes, by whom and when?
Not defined reasons. Beth Elliott left me a voice message on Dec. 12 2005.

QUESTION: What reasons were provided to you?
The message left on my voice mail basically stated that while my interview went well, it was determined I was not the best fit for the position.

QUESTION: Why do you believe you were not selected because of your race?
I was previously responsible for most of the duties that are now the responsibility of the new Program Analyst. I trained the selectee for the duties she is now responsible for as the Program Analyst, our experience levels are not on the same level as I was the program coordinator for the awards program as well as managing the contracts for services for the awards since July of 2004 – May of 2005. Ms. Hockaday was in charge of the program from May 2005-November 2005 when she was selected for the position. I also, hold a degree in Human Resources Management from Florida State University.
I was one of two African-Americans who applied and interviewed for the position. Both African-American candidates had college degrees in Human Resources. Together, we had approximately 4 years experience performing the duties of the position. In contrast, the selectee, who is Caucasian, has no college degree and, prior to her selection, she had approximately 4 months experience performing the duties of the position.

QUESTION: Why do you believe you were not selected because of your gender?
I believe that gender played a part in my non-selection due to the fact that I was on maternity leave when these plans were made to remove me from the position that prior to my pregnancy I was deemed fully successful in accomplishing my job priorities and goals. It was only until I returned from my approved maternity leave that I was no longer the right fit for my job.

QUESTION: Have you been involved in prior EEO activity, e.g. filed a prior EEO complaint, provided a statement or affidavit as part of an EEO investigation, etc.?
Yes, I visited the counselor October 11 shortly after discovering my job had been taken from me.

QUESTION: If yes, what was the nature of that EEO activity and when did it occur?
October 11, 2005, at my return to work from an approved maternity leave I contacted the EEO office to discuss my options regarding the removal of me from my previous job duties. I began proceedings based on my dispute regarding being removed from my previous job while on maternity leave. I was contending

**26**

Affidavit of Shauna White
TD 06-2231
Page 4 of 15

that they had removed me without any notification and I felt it was a violation of my rights based on the laws governing maternity leave as well as FMLA.

When I returned from approved maternity leave 2 months early (also approved) I was not provide a place to work or work to do. My personal effects were packed away and my former assigned workstation was occupied. In addition, I was not given any work and was even told by the person I trained to fill in for me during my leave Ms. Hockaday, that they had instructed her that I was not to do any work with the awards program; therefore she was unable to give me any work. Ms. Hocaday told me that all she knew was that I was expected to sit in the workstation of a co-worker who was out on extended medical leave as for my duties she was unsure of what I was to do.

In October 2005, my former Director M. Santiago was out of the office for the month due to medical reasons. Therefore, nothing was prepared for my return even the person taking over for M. Santiago, Beth Elliott did not contact me to guide me in what my duties would be since it was determined that Ms. Hockaday would keep doing my former job even though I was back and her rotation assignment was to be ending soon.

QUESTION: Was the person selected for the position of Program Analyst NB-0343-IV involved in prior EEO activity?

Not to my knowledge.

QUESTION: Was management aware of the selectee's prior EEO activity?

NA

QUESTION: If yes, how and when did management become aware of this activity?

NA

QUESTION: Was management aware of your prior EEO activity?

YES

QUESTION: If yes, how and when did management become aware of this activity?

Management was involved with the mediation sessions when we were trying to come to an agreement on whether they were allowed to remove me from my duties while on an approved maternity leave. I was in the process of mediation when my job was posted under a new title with slightly altered duties. I went on with the mediation believing that management had intentions of resolving t his issue with me, Beth Elliott even mentioned in a meeting that I was welcome to apply for the job, although DC Petitt mentioned in mediation that I was never even contemplated for the job.

QUESTION: How did the person(s) making the selection become aware of your EEO activity?

I can only assume, following my October 11, 2005 visit to Laurie Cymbor, reports were made available to management.

27

QUESTION: How did the person(s) making the selection become aware of the selectee's EEO activity?

>NA

QUESTION: Why do you believe you were reassigned to the position of HR Assistant NB-203-IV because of your prior EEO activity?

>When I returned to the office I had to request a meeting to discuss with Deputy Comptroller C. Petitt my position, and the situation I had returned to find. I returned to my job and found all my personal belongings packed away in boxes; both of my former workstations were occupied. Therefore, I had no place to sit initially, and more importantly I was provided no direction or plan on what to do regarding my duties or responsibilities.

>During my requested meeting with DC Petitt, I was told that I was not going to be returning to my former duties that they had made changes that were in her opinion a better fit for the division. I was offered and declined, a position as HR Assistant, which I felt was in effect a demotion of status and responsibility compared to my previous job functions. The content of our conversation was shocking and devastating both professionally and personally.

>DC Petitt, brought out a number of accusations and presumptions regarding my understanding with Director Santiago about my job. Since Director Santiago was not on active duty with the agency at my return, these statements were all I could measure my circumstances. Therefore; I felt it was necessary to, DC Petitt's comments during this conversation were quite sharpe especially in response to my adamant refusal to being pushed into the position of HR Assistant after having earned the Specialist title prior to joining WFE.

>DC Petitt responded that she had never experienced anyone saying "no" to work. I got the impression she felt I should be happy to have been offered a position at all, therefore, when I declined she was shocked and I'd say put out. During my mediation sessions the Deputy Comptroller for WFE Cindy Petitt told me, that I was never in the running for this job and this was before the job was even posted.

QUESTION: Why do you believe you were reassigned to the position of HR Assistant NB-203-IV because of your gender?

>Again I base the claim of gender discrimination on the fact that I was on maternity leave when they put in place this position/job change without my consent or input. Once I returned I was prevented from continuing my former duties and told by the rotational employee I trained that she would be remaining to do the job I once held and that she was told not to give me any work related to the awards program.

QUESTION: Why do you believe you were reassigned to the position of HR Assistant NB-203-IV because of your race?

Affidavit of Shauna White
TD 06-2231
Page 6 of 15

I believe my race was key in the removal of me from my job based on the fact that once it was approved to be upgraded to a program analyst position they were unwilling to let an African American woman hold the job.  Both the previous employee who filled the job with countless more tasks assigned to the job and myself were denied the upgrade when asked.

Ms. Hockaday is a white woman who until May 2005 held a job as a secretary, handling mainly administrative duties nothing that would give her more qualifications than myself or Kim Ware for a job/duties that we held/performed for over a year.  In Ms. Ware's case over two years.

QUESTION:  Are you aware of other staff members under the supervision of Ms. Elliott, Ms. Petitt, or Ms. Santiago who were reassigned to other positions after returning from maternity leave?  If yes, please provide their names and organizational unit.
        No

QUESTION:  Are you aware of other staff members under the supervision of Ms. Elliott, Ms. Petitt or Ms. Santiago who competed for positions after returning from maternity leave?  If yes, please provide their names and organizational unit.
        No

QUESTION:  Do you have any supporting documentation for the record?  Please provide copies.

QUESTION:  Do you know of any witnesses who have relevant knowledge of the issues under investigation?
        Cindy Westray

QUESTION:  What remedy are you seeking?
        Restoration to a position equivalent to Program Analyst, Series 343, NBIV-V.  The position must have the same promotional potential; my understanding is that the selectee, whom I trained, Ms Hockaday can be promoted to a V at any time with no further competition.
        I am seeking compensatory damages based on emotional distress resulting from the agency's actions.  In addition, any fees I have incurred by defending myself in this process, as well as any an all other relief to which I am legally entitled.

QUESTION:  Is there anything that you wish to add to your statement?

        In an agreement w/Director Santiago in February 2004- I would leave Continuing Education to join her in Workforce Effectiveness as her assistant, handling various administrative tasks, such as scheduling of several off-site transitional meetings.  With the understanding/agreement that I would not lose my 201 series, and would remain classified as an HR Specialist.
        The plan was to give me the opportunity to train with the HR Specialists and take various training in staffing and classification as well as other processing

29

courses once transition was completed. This would then give me the experience to transition to being a full HR Specialist or have the option to post for positions as they became available.

Around the end of May 04, I found out I was 2 months pregnant, I told no one at work. I began having difficulties around June 5th and I called in on Monday June 7th. I had been out for leave the week prior and Monday was to be my first day back since the 28th of May. I had been in contact with the Director while out on leave, however, I did not expect to have to call in on Monday so the plans we made regarding her needing me on Monday were complicated because I needed to go to the doctor.

When I told her I would not be in, that I was pregnant and I believed I was experiencing complications, her response was not at all what I expected and centered around my not being able to do what she brought me here to do. She stated that she had brought me here and this is how I repay her, she had to find out like this that I was pregnant. She said at that time that this arrangement with me working for her was not working, I tried to explain and in the end told her I would be in as soon as possible and called my doctor to make an evening appointment.

I came into the office approximately 11:30 am and began doing the things the Director needed done, she did not speak to me at anytime during this day, she did respond to my emails regarding work. On Tuesday, she called me into her office and said again that this would be a good time to transition me to other HR duties so I could get the training/experience she had promised when she brought me up here, she never apologized straight out for the call but she did ask how I was feeling and congratulated me on the pregnancy. At the time I took that as her apology. She then mapped out the change that was to take place and the next day she sent out an email message explaining the job switch.

June 04 we began working on the transition of my duties to Kim and hers to me. At that time it was determined that we needed to have a backup for awards so we also trained Lesa Wood. I went out for sick leave the week of June 21 when it was determined that I was suffering a miscarriage. I came back to work July 1[st,] 2004 and my duties were as follows:

- Awards Program
  - Processing & delivery of awards
  - Retain supplies and place orders for retirement gifts & certificates
  - Ordering Length of Service and Federal awards
  - Coordinate and order for Comptroller's Annual Awards
  - Coordinate special orders for OCC special awards
  - Prepared letters for signature using Autopen w/Comptroller's signature
  - Responsible for requests for any Autopen needs for the agency & maintained Autopen machine

30

- o Maintain supply of mementos and disbursement of mementos
- o Monitor and make budget decisions for Awards & Mementos w/ S. Hart
- o Serve as COTR for awards contract & mementos purchases
- o Collected and selected bids for various gift items for inventory
- o Made purchases for mementos with credit card & completed close out process each month
- o Collect data for OM Metrics
- Orientation Program
  - o Maintain new hire packet to ensure materials were current.
  - o Organized preparation of packets for HR Solutions
  - o Coordinate with presenters for orientation
  - o Prepare & modify agenda for orientation
  - o Notification to all parties are aware of new employees on-boarding to ensure all processes are engaged for employees arrival. (IT passwords, security building access)
  - o Directed the orientation, making sure presenters were available and prepared.
  - o Assisted employees complete HR forms, collected for processing
- Contact responsible for the payment process of items/space for District Recruitment
- HR Solutions purchases
  - o Supply orders
  - o Special promotions, i.e. DSC give-aways,
  - o Ordering subscriptions and/or journals for SHRCs
  - o Completed credit card close out process each month

Shortly after Kim took over my duties as Director Santiago's assistant, the Director determined that Kim would be of greater use reporting to Director Cofield; Kim was transferred to the Employment & Diversity division early to mid August 04. At that time the administrative tasks and Director Santiago's calendar/scheduling shifted back to Lesa Wood and myself to share. September 29th, Lesa was selected to fill an HR Assistant position; therefore, she no longer assisted with awards or handled the Director's Calendar & various administrative tasks such as scheduling and planning meetings/conferences, arranging conference calls and travel. In addition, I was asked to take over the Time Entry & TTRS processing for HR Solutions & WFE Head Office.

**31**

I became pregnant again and in February 2005 I asked for and was approved 6 months Maternity Leave (proposed to begin mid-June), in preparation for this absence my Director asked me to develop, a series of processes and maps to have as guidelines for anyone to follow for awards for this task I was provided the assistance of Delores Smith, in addition I was to prepare an opportunities board posting for my duties, prepare training materials to train replacement as well as new Denver Service Center (DSC) awards team.

During the next 3 months I with Director Santiago's approval worked overtime, earned credit hours to ensure that the clear processes were in place for awards and developed the process maps and procedures to follow with D. Smith as well as continue to keep up with the awards and my other duties.

May 17 I had my mid-year review with Director Santiago, at the meeting we discussed the need for efficient prioritization of my time and how to better use the temporary assistant we had hired. We also discussed data for matrix regarding awards and the format that was needed, I was asked to prepare a developmental plan by the end of May.

At this time Director Santiago talked about plans to make my current job one of more responsibility, Director relayed plans to increase the grade level of job to a band V; however, mentioned that I would need to take on additional duties such as the temporary services contract work for HR Solutions to include the file room as well as various reporting duties such as the matrix requirements for OM where HR Solutions was concerned.

Director Santiago inquired whether I thought I could handle these duties and I said that with the current load of various miscellaneous administrative duties it would be a hard task, however I would do my best. It was then told to me that many of those items would be eliminated to allow me the time to better direct my attentions to the more important tasks such as the management of the awards program and contracts. We also talked about the duties that replacement would take over in my absence with Director Santiago. It was then determined what the rotational replacement T. Hockaday would handle:

o   Handle OCC & Federal Service awards/Retirement program, OCC mementos, processing of monetary awards, handle Directors administrative needs such as scheduling, travel, etc.; time-entry, supply ordering, (adjusted later to be handled by administrative person-T. Robinson)

o   Excluded duties; Orientation, Purchasing mementos (adjusted later to include), reservation and payment for district recruitment, Where's my Watch project-meetings,

My last day of work was May 25th, I left at 4:30 and went to a scheduled appointment at that time my doctor determined that I would need to be admitted to the hospital and I gave birth to my son two days later. Since this was a month ahead, I did not get the chance to have the rotational replacement T. Hockaday sit with me and train as I worked, however, I did put together a comprehensive book with all procedures for awards and ordering supplies for her to use as a guide. During my leave I was available to both my Director and T. Hockaday either by phone or email, and I had a few meetings via phone with both.

32

Affidavit of Shauna White
TD 06-2231
Page 10 of 15

- Discussed with replacement difficulty in maintaining all collateral duties along with awards program. Received email regarding this-
- Discussed with Director inability off replacement to function in all my capacities
- Shortly after 2nd month out was called by Director Santiago and discussed briefly whether I would be taking the full 6 months, I mentioned that I may be able to return earlier or work from home to help back-log.
- Director contacted me to inform me that she had retained additional administrative help for the group (T. Robinson) and that several of my former duties would now flow to her.
- Upon speaking with replacement determined since her duties were being more focused to only awards she would be able to handle the back-log on her own therefore she didn't need to have me work from home and would let me know if things changed.
- Received call from Director that HR Solutions was examining the potential of moving the majority of the assistant work to Denver.
- Discussed the potential move of assistant work load with replacement shared her views on this and was emailed by Director Santiago that she heard I was planning a move to Denver from replacement and that I was starting rumors and discussing things that I had no information about and that it was disruptive to "WFE, HR Solutions and the Agency". My response was to inform the Director was that her information on my conversation with replacement was not correct and that I merely said I wouldn't mind working in Denver since I had never been.
- Received call from replacement apologizing for the mistake, she said that she had never said those things to Director
- Director requested via phone Doctor's note to secure leave since my leave balance was becoming low.
- Received another call from Director asking me what part of my job I enjoyed most as we were shifting job duties due to needs. At this time I began to feel as if there was definitely something up with my job. Last week in July
- First week in August I called Director to know if I would be able to come back early from leave if approved, to which she seemed anxious to expedite as we needed all the help we could find.
- Spoke to replacement was informed that Director had assured her that she would not be leaving HR Solutions upon my return. That she would be continuing on with awards.
- On or about Received 3rd call from director stating she wanted to see me and could I come in which I did on August 9, Director informed me she had dismissed assistant director and that she would discuss with me upon my return what I would be doing. I discussed with director briefly about my job, which she said not to worry about that I would not be without a job. Did not specify and was vaguely saying that they were possibly going to change the awards so, if I was interested in other jobs I could be an HR Assistant or possibly go out to the agency to see about opportunities. Jennifer Kelly was mentioned
- Received a fourth call from Director asking me to come back as her assistant in a message, then when I call back was given Mark Nishan's name to solicit a job.

**33**

I returned to work on 10/3/05, at that time Director Santiago was out on sick leave as she had told me on her last call to me that was to extend until November. Upon my arrival, I did not have a workstation; Tiffany now occupied the one I had left and the rotational T. Hockaday was in the former office I had moved out of prior to my leave. No one had any direction for me in terms of what I was to do, or where I was to sit until T. Hockaday informed me I was to sit in the cubicle of an employee who was out on extended leave.

All of my personal belonging had been packed up and sat in boxes, my phone was not transferred, and I was not given any work assignments. When I asked T. Hockaday if I could help, she that "they" said not to give me any award items to work on, so I busied myself with getting reacquainted with the office, and offered help to the other HR Assistants.

On that same day I requested a meeting with DC C. Pettit and in the course of that conversations was informed that I was not the proper fit for managing the program, that I didn't have the proper training and that my strengths lay in pure customer service therefore, I would be best used as an HR Assistant (203 series considered a down grade from my current 201 series). I was further told that Teresa Hockaday, in the short time she was in my position was determined a better fit and that she would continue to manage the awards program.

DC Petitt stated that I was never wanted in WFE; in fact that I came with Director Santiago was something they (WFE) was forced to take since they wanted her. I was told that my skills were not that of someone who could successfully run the awards program, that I was more suited to start from the bottom to learn all the ins and outs of HR in government. In addition, I should see it as a great opportunity for me to learn HR by taking an assistant position.

DC Petitt disclosed that in discussions she had with Director Santiago it had been determined that I would not be returning from maternity leave to my previous position, she also stated that she was under the impression that I was in discussion with Director Santiago regarding this matter. I was not and expressed to her how misinformed she was and her response was "I should have known I was not coming back to the same job". I informed DC Pettit of the conversation I had before leaving where Director Santiago talked about upgrading my current job and the responsibilities, that I would be expected to fulfill a greater range of reporting functions to substantiate the upgrade.

I clearly informed DC Pettit at no time prior to, during or since maternity leave did Director Santiago tell me I would not be considered for the job. DC Pettit nearly laughed as she stated that at no time was I thought of or in consideration for this position and that she and others had discussed my work and it was never anyone's intention that I ever be considered for the new job, additionally, that I didn't have the experience or ability to function in the position. She further disclosed discussions she had held with people that I had worked with previous to my leave who gave her unfavorable comments and felt that my expectation to have the job at a IV-V level was absurd.

I did mention that at no time prior or since had I been notified that there was a performance problem and that my performance evaluations to date had not reflected

**34**

any problems. At that point she did offer me a position in WFE, and was somewhat baffled when I said that I was not interested in the HR Assistant job, stating that since my function prior to leaving was on the same lines of inputting/processing in HR Connect and that it was truly a great opportunity for me to learn from the ground up what Government HR was about. When I mentioned to her that it would be a downgrade for me she said that I didn't function as anything above an assistant before my leave so work wise it was the same.

In addition, she mentioned when Director Santiago insisted on bringing me to WFE it was understood that my position was to be classified as an assistant in the 203 series therefore this job would be no real change. Once she understood that I was unwilling to take the downgraded position she informed me that I needed to then look for a job either outside the division or outside the agency all together. Subsequently, it was arranged for me to be provided with what is often given to displaced employees who jobs have been phased out.

In closing the discussion I informed DC Petitt, that I was completely blindsided by coming back to my job to be informed by the very person I had trained to sit in for me while out on maternity leave, that I would not be getting my job tasks back. I expressed to her how humiliating and hurtful it had been to have to seek out menial and clerical tasks in order to feel useful and add value to the rest of the staff.

At that time she did offer the Assistant job again, I did say I would help in anyway I could but that I was unwilling to take this job position swap as I felt it was a downgrade and would be detrimental to my advancement here or anywhere in federal government employ. It was then that I was told again that I would need to look for a job outside the division or agency.

The next two days consisted of me asking the other Specialist and Assistants in my division if they could use my help, getting piece meal work from everyone kept me. It was truly humiliating and difficult to explain to those who asked why I wasn't working on the awards now that I was back. It seemed many people did know before I got back that this change was being made, several co-workers as well as my replacement mentioned that. It was suggested by a co-worker that I talk to Beth Elliott, who was at the time "Acting" Director of HR Solutions in Director Santiago's absence, so I asked for a meeting on October 6.

In my discussion with Director Elliott, I was informed that the rotational employee brought in to replace me during my leave would remain in that position indefinitely, that my job was being dissolved and a new one was being created. That it would be posted and while I would be welcome to apply I need to realize it is not the same job that I left it had more than just awards work. I told her that I appreciated her inclusion, however, DC Pettit previously informed I that I would not be considered.

I expressed to Director Elliott my feelings upon returning to work, my feelings of being unwelcome and isolated since I was not being provided with any guidance of what my role would now be. In addition, I asked again why I was not informed of why this was happening, why was it that I had to come to both her and DC Pettit to raise this issue.

On October 11, I went to speak to Laurie Cymbor in the Workplace Fairness & Alternative Resolutions Division; I explained to her my problem and my take on what was happening. I really didn't know what was happening at that point since I had not

**35**

really been notified why and when my duties would change expect when I requested meetings. During the next weeks I was in constant contact with the WFAR office, trying to determine the best way to address this situation.

Ms. Cymbor advised me that I had two choices: file an informal EEO complaint within 45 days, or participate in the agency's ADR program. Ms. Cymbor advised me that the EEO complaint process is "longer, more adversarial and that I must be sure." More importantly, she misled me about the 45-day time limit for filing an informal complaint. Ms. Cymbor told me that if I "go FAIR I still have the option to change and go EEO."

Ms. Cymbor also told me that if, through the ADR process, I discover facts, which reinforce my conclusion that I was discriminated against, "it can be recognized later." Finally, Ms. Cymbor asked if I "really believed they took me out of my job because I was away on maternity leave," because an EEO complaint "is always open if the mediation does not" work. I chose to participate in the agency's ADR program.

We began mediation October 24 and due to an unexpected appointment we closed the session at noon. The shorten session did not hinder DC Petitt in her attack on my character as an employee as well as my performance in my previous position. I endured over an hour of her shocking overview of my work and performance as well as her portrayal of what I should have been prepared for due to her conversations with my director M. Santiago. DC Petitt mentioned several co-workers who had provided her with negative feedback regarding their working relationship with me as well as a performance issue that I was supposed to have discussed with my director prior to my leaving for maternity leave.

In addition, it was also mentioned that I should have known I would not be coming back to perform the same duties and that I had discussed the various options of jobs prior to leaving with director Santiago. I made sure that DC Petitt knew that her assumptions that this was not news to me was incorrect, that I was not only unaware of her and director Santiago's displeasure with my work, that I was expecting to be taking on the temporary contracts so that the job would be open to be upgraded to a V. DC Petitt was nothing short of insulting when she indicated that I was and never would be considered as a candidate for the new position.

At noon we closed the session and agreed to meet again as our schedules permitted, on the 27th WFE posted my former position under it's new name Program Analyst. During the next several weeks DC Petitt was unavailable for the continuation of the mediation, I applied for the position despite the obvious indications from her that I would not be considered.

I was deemed to be qualified for the job and interviewed, however, they did in fact select the person whom DC Petitt told me on my first day back from maternity leave was a better fit for the job. In a voice mail message left by my current supervisor Beth Elliott on December 2nd, I was informed that I was not selected; her only explanation was that while I gave a good interview they decided Teresa was a better fit.

- Discussed with B. Elliot additional duties that I would be responsible for.
    - Orientation Program

  o Maintain new hire packet to ensure materials were current.
  o Organized preparation of packets for HR Solutions
  o Coordinate with presenters for orientation
  o Prepare & modify agenda for orientation
  o Notification to all parties are aware of new employees on-boarding to ensure all processes are engaged for employees arrival. (IT passwords, security building access)
  o Directed the orientation, making sure presenters were available and prepared.
  o Assisted employees complete HR forms, collected for processing
- Post job selections
- Print and distribute SF50's & 1150's
- Print and distribute daily SINQ reports
- Assist with any additional administrative needs for HR Solutions

- Mediation continued 12/7
- Received email 12/14-email contained negative comments about my work and me; at this point I decided that there would be no reason to continue mediation.
- Communicated with EEO office that I received this email by mistake, also told Director Santiago
- Cheryl Davis asked to speak to me regarding the email and express apologies with explanation that the statements were taken out of context.
- Filed case with EEO 12/16
- C. Pettit requested to speak to me; I declined and asked that she wait until I returned from my vacation. She pressed and got me into a conference room to explain how this whole thing had just gotten out of hand and that upon my return we would do everything we could to settle this matter and that I was valued despite the poor way WFE had treated me, since my return from maternity leave.

That promise never materialized in fact when I decided not to take the position they created for me, which was an assistant in relocation. All deals were then taken off the table and I was forced to take the human resource assistant position. They reassigned me to the very job I had refused to accept when they took my previous job from me during maternity leave.

On December 15, 2005, following the unsuccessful conclusion of ADR, speaking with Ms. Cymbor once again, I reiterated that I would be filing an informal EEO complaint based on the OCC's preventing me from resuming my job duties after my return from maternity leave. I also informed her, for the first time, that I am contesting my non-selection based on the OCC's failure to select me for the Program Analyst, Series 343, NB IV-V position, which, in effect, is my old job.

**37**

Affidavit of Shauna White
TD 06-2231
Page 15 of 15

I wanted to state again for the record all that I have been through since coming back to work after my approved maternity leave 2 months early. I came back early due to conversations that I had both with M. Santiago and Ms. Hockaday throughout my leave nearly each week, which led me to believe my job was in jeopardy.

When I came back I was faced with the humiliating process of fighting for my job and my reputation. I faced questions from other co-workers that I could only deflect by stating "I am looking into a job change" trying to save face and not have to say that I don't know what I am going to do and I don't know why they are not letting me proceed with my job.

I have suffered tremendous emotional stress both during my leave and since which I at first thought was based on the birth of my child but after discussing with counselors have seen that it was really a result of feeling unsure of my job and the anxiety of returning. I believe that I was a loyal and dedicated worker for the OCC both before and since my return from my leave and I feel I deserved better both morally and lawfully.

I have been hurt and embarrassed for no reason, and despite that I have made it my goal to function in the role that WFE has forced me to be in since downgrading my position to that of an Assistant from a Specialist. Among my co-workers it has been uncomfortable to say the least, often side stepping questions or statements. Working in the same division as the person I trained, who now has the job duties I was once responsible for, all of these things have made the workdays since my return difficult and stressful. I believe WFE has placed me as well as my co-workers in a truly difficult and uncomfortable situation.

However, despite the lack of formal training provided for the job I was forced to fulfill and the uncomfortable work environment I have worked diligently toward providing the best assistance to the specialist I was assigned to as well as the HR Solutions staff and all of OCC employees that I service.

I have read the above statement. It is true and complete to the best of my knowledge and belief. I understand that the information I have given is not confidential and will be part of the record and may be shown to interested parties.

Subscribed and sworn or affirmed this _16th_ day of _June_, 2006.

_____
Shauna White

_____          June 26, 2006
Debbie-Anne Burt                          Date
EEO Investigator
JDG Associates

## PRIVACY ACT NOTICE TO COMPLAINANT
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *the Office of the Comptroller of the Currency* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Failure to furnish the information may result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

Signature of Interviewer

Signature of Complainant

Date: 6/7/06

Place: OCC - HQ

**39**

# EEO COUNSELING REPORT - INDIVIDUAL COMPLAINT
## PART I (Through Initial Interview)

*(Follow separate instructions and use a continuation sheet if necessary)*

| | |
|---|---|
| **1. EEO Officer**<br>**Name, Address and Telephone Number**<br><br>Linda Lynn Batts, Director<br>Workplace Fairness and Alternative Resolutions<br>250 E Street, SW MS 2-6<br>Washington, D.C. 20219<br>(202) 874-5360 | **2. EEO Counselor**<br>**Name, Address &**<br>**Telephone Number**<br><br>Laura St. Claire<br>250 E. St., SW, MS 2-6<br>Washington, DC 20219<br>(202) 874-5360 |

**3. Date Counseling First Sought**

December 16, 2005

**4. Date of First Interview**

January 4, 2006

---

**5. Employee or Applicant: Name, Business or Home Address. Employee: Official title, Series & Grade**

Shauna White
3426 Andrew Court #101
Laurel, Maryland 20724
301/490-8602 (h) 202/874-1036 (w)

**6. Basis or Type of Discrimination**

Age
Date of Birth

D/M/Y

☐ Religion    ☐ Color  X Race
**Black**

☐ National Origin    X **Sex**
**Pregnancy Discrimination**    ☐ Other

Handicap:
☐ Mental
☐ Physical

☐ Retaliation/Reprisal
for Involvement in
Complaints Process

**7. Matter Causing Complaint or Issue**

☐ Appointment  ☐ Pay        ☐ Training

☐ Assignment of  ☐ Promotion   ☐ Within
Duties                       Grade Increase

☐ Awards        X **Reassignmt.**  ☐ Working
Conditions

☐ Change to Lower  ☐ Reinstate.   X **Other**
**Non-selection**

Grade

☐ Classification  ☐ Removal/Separation

☐ Conv to F/T CC   ☐ Reprimand

☐ Duty Hours       ☐ Resignation

☐ Eval-Appraisal ☐ Retirement
Merit Pay

☐ Eval-Appraisal ☐ Sexual Harassment
Non Merit Pay

☐ Exam/Test        ☐ Suspension

☐ Harassment       ☐ Termination During
Probation

☐ Overtime         ☐ Time/Attendance

9

8. An EEO Counselor cannot reveal the identity of a person who has come for counseling, except when authorized to do so by the person counseled.  Is Complainant willing to have his/her name revealed during the counseling stage? Yes X  No ☐.  If answer is Yes, Complainant must give permission by signing in the space below:

Complainant waived anonymity.  See Tab A

| 9. Organization where Alleged Discrimination Occurred and Date of Occurrence. | 10. Give date Complainant became aware of alleged discrimination if substantially different from that shown in 10.  Explain. |
|---|---|
| Office of the Comptroller of the Currency<br>Workforce Effectiveness<br>250 E Street, SW<br>Washington, DC  20219<br>October 3, 2005 and December 6, 2005. | N/A |

11. If complaint appears to be untimely, what explanation is offered to explain why Counselor was not contacted within 45 days?

Complainant chose FAIR mediation as the avenue for redress regarding the October 3, 2005 reassignment.

12. Provide a brief description of complaint, summarizing actions which caused counseling to be sought and which Complainant believes is discriminatory.

Shauna White, Human Resources Specialist, NB-0201-04 (hereinafter, Complainant), alleges that when she returned from maternity leave on October 3, 2005, she learned that the position she occupied prior to her maternity leave was assigned to, and would remain with, Teresa Hockaday, Program Analyst, NB-343-04 (hereinafter Detailee).  Complainant also alleges that on December 6, 2005, she was discriminated against because of her race (black) when she was not selected for a Program Analyst position in Workforce Effectiveness (Vacancy Announcement #MP-HQ-06-024).

13. Remedial Action Desired by Complainant

Complainant originally requested that her job series remain as a 201 or 301.  In response to Management offers, the Complainant's suggestions for remedies included:

- a detailed development plan, with benchmarking, to provide an opportunity for the Complainant to move from the NB-IV to NB-V level; and

- a desk audit within 12 months, conducted by an independent evaluator, to determine whether the Complainant's duties had accredited to the NB-V payband level.

14. On the same matter, has Complainant filed a grievance under a negotiated grievance procedure? Yes   No X
Under the Agency grievance system? Yes ☐  No X
Has Complainant appealed to the Merit Systems Protection Board? Yes ☐  No X
If grievance or appeal has been filed, what is its status?  N/A

| 15. Does Complainant elect to have a representative?<br>Yes X  No<br><br>See Tab B | 16. Signature of Counselor and Date Signed<br><br>Pama St Clair  2/28/06 |
|---|---|

**10**

*EEO COUNSELING REPORT - INDIVIDUAL COMPLAINT*
*PART II (For counseling after initial interview.)*

*(Follow separate instructions provided.)*

**17. Contacts During EEO Counseling Inquiry**

| Date(s) of Contact (Col. 1) | Name, Title, Grade, Telephone (Col. 2) | Organization Admin. Code (Col. 3) | REASONS FOR CONTACT (Complainant, Witness, Management Official, Personnel, etc.) (Col. 4) | Time Spent by Person Contacted (Col. 5) |
|---|---|---|---|---|
| 12/16/05 | Shauna White, | Office of | Schedule initial interview | 5 minutes |
| 12/30/05 | NB-0201-04, | Management | Schedule initial interview | 3 minutes |
| 1/3/06 | Human Resources | Workforce | Schedule initial interview | 3 minutes |
| 1/4/06 | Specialist | Effectiveness | Initial interview | 90 minutes |
| 1/10/06 | | (HRS) | Discuss remedy proposed by Management | 80 minutes |
| 1/11/06 | | | Clarification of counterproposal to Management | 20 minutes |
| 1/12/06 | | | Clarification of request to Management | 10 minutes |
| 1/20/06 | | | Discuss Management's Counterproposal | 30 minutes |
| 1/24/06 | | | Answer questions about Management's Counterproposal | 60 minutes |
| 1/26/06 | | | Attempt to clarify issues raised by Complainant on 1/24/06 | 60 minutes |
| 1/31/06 | | | Attempt to clarify issues raised by Complainant on 1/24/06 | 60 minutes |
| 2/10/06 | | | Discuss Management's Counterproposal | 60 minutes |
| 2/14/06 | | | Discuss Management's Proposed Settlement Agreement | 45 minutes |
| 2/16/06 | | | Set meeting to discuss Proposed Settlement Agreement on 1/21/06 | 30 minutes |
| 2/21/06 | | | Meeting to discuss Settlement Agreement. | 45 minutes |
| | | | Final interview.  Issued NRF | 15 minutes |
| 12/16/05 | Crystal Maddox, | Representative | Schedule initial interview | 5 minutes |
| 12/29/05 | NB-0570-06, | | Schedule initial interview | 5 minutes |
| 1/4/06 | National Bank | | Initial interview | 90 minutes |
| 1/10/06 | Examiner | | Discuss remedy proposed by Management | 80 minutes |
| 1/11/06 | | | Clarification of counterproposal to Management | 20 minutes |
| 1/12/06 | | | Clarification of request to Management | 10 minutes |
| 1/20/06 | | | Discuss Management's counterproposal | 30 minutes |
| 1/26/06 | | | Attempt to clarify issues raised by Complainant on 1/24/06 | 60 minutes |
| 2/10/06 | | | Discuss Management's Counterproposal | 60 minutes |
| 2/14/06 | | | Discuss Management's Proposed Settlement Agreement | 45 minutes |
| 2/16/06 | | | Set meeting to discuss Proposed Settlement Agreement on 1/21/06 | 30 minutes |
| 2/21/06 | | | Meeting to discuss Settlement Agreement. | 15 minutes |
| | | | Final interview.  Issued NRF | 15 minutes |
| 12/30/05 | Connie Becker, | Office of | Request info on vacancy announcement | 15 minutes |
| 1/05/06 | NB-0303-03, | Management, | Info on vacancy announcement | 15 minutes |
| | Human Resources | Workforce | | |
| | Assistant | Effectiveness | | |
| | | (CBCS) | | 30 minutes |
| 1/05/06 | Cindy Petitt, | Office of | Management Response | 5 minutes |
| 1/06/06 | NB-0301-08, | Management, | Clarification of Management Response | 15 minutes |
| 1/1106 | Deputy | Workforce | Discuss counterproposal | 15 minutes |
| 1/18/06 | Comptroller | Effectiveness | Discuss counterproposal | 5 minutes |
| 2/8/06 | | | Staff contact for remedy | 15 minutes |
| 2/10/06 | | | Discuss Complainant's Counterproposal | 30 minutes |
| 2/14/06 | | | Proposed Settlement Agreement | 30 minutes |
| 2/16/06 | | | Set meeting to discuss Proposed Settlement Agreement on 1/21/06 | 45 minutes |
| 2/21/06 | | | Meeting to discuss Settlement Agreement. | 15 minutes |
| 1/12/06 | Yvonne Ryan | OPM | Discuss remedy suggested by Complainant | |
| | | | | 30 minutes |
| 1/13/06 | Bob Hendler | OPM | Discuss remedy suggested by Complainant | |

**11**

| Date(s) of Contact (Col. 1) | Name, Title, Grade, Telephone (Col. 2) | Organization Admin. Code (Col. 3) | REASONS FOR CONTACT (Complainant, Witness, Management Official, Personnel, etc.) (Col. 4) | Time Spent by Person Contacted (Col. 5) |
|---|---|---|---|---|
| 2/8/06 | Laura Biggs, NB-0301-05, Relocation Specialist | Office of Management, Workforce Effectiveness (EP&PI) | Assistance with proposed remedy | 15 minutes 15 minutes 15 minutes 5 minutes 10 minutes 45 minutes 10 minutes |
| 2/10/06 2/13/06 2/16/06 2/21/06 | Beth Elliott, NB-0201-07, Supervisory Human Resources Specialist | Office of Management, Workforce Effectiveness (EP&PI) | Discuss Management's Counterproposal Assistance with proposed remedy Assistance with proposed remedy Set meeting to discuss Proposed Settlement Agreement on 1/21/06 Meeting to discuss Settlement Agreement | |
| 2/21/06 | Mary Santiago, NB-0340-07, Supervisory Program Manager | Office of Management, Workforce Effectiveness | Meeting to discuss Settlement Agreement | |

**18. INFORMATION DEVELOPED DURING INQUIRY (Identify the source of each fact; attach relevant documents provided by employee/applicant, management officials involved, other witnesses, personnel, etc., or those obtained by the Counselor.)**

**Background**

Complainant alleges she was discriminated against due to pregnancy when she returned from her maternity leave on October 3, 2005. At that time, certain duties that had been assigned to Detailee during Complainant's maternity leave remained assigned to Detailee after Complainant's return to work. Complainant contacted WFAR regarding this issue and elected mediation under the FAIR process. Complainant alleges she was discriminated against due to race (black) when she was not selected for the Program Analyst position in Workforce Effectiveness on December 6, 2005 (Vacancy Announcement #MP-HQ-06-024).

**Complainant's Issues**

**Issue 1:** Complainant alleges she was discriminated against due to pregnancy when she returned from maternity leave on October 3, 2005. At that time, certain duties that had been assigned to Detailee during the Complainant's maternity leave remained with Detailee after Complainant's return to work. Complainant contacted WFAR regarding this issue and elected mediation under the FAIR process (Counselor was not involved in that process so can not provide information on Complainant's issues). Complainant also alleges numerous acts of discrimination based on pregnancy from 2004 to present. Complainant promised to give Counselor a detailed list of these acts but that chronology was not provided during the counseling phase. Therefore, Counselor could not approach management regarding any of those issues.

**Issue 2:** Complainant alleges she was discriminated against on the basis of race (black) when she was not selected for the Program Analyst position in Workforce Effectiveness on December 6, 2005 (Vacancy Announcement #MP-HQ-06-024).

**Agency's Response**

**Issue 1:** According to Mary Santiago, Supervisory Program Manager, NB 0340-07 (hereinafter, former Supervisor), Complainant requested that certain duties not be reassigned to her when she returned after maternity leave, including the awards program and that. Complainant had indicated a desire to relocate to the Denver Human Resources office. Cindy Petitt, Deputy Comptroller, NB-0301-08 (hereinafter, Management), and former Supervisor stated that reassignment of duties was also due to performance issues. Complainant elected the FAIR process to resolve this issue (Counselor was not involved in that process and can not provide information on Management's response).

**Issue 2:** Management stated Complainant was interviewed for the Program Analyst position but not selected because of performance issues. For example, Management stated there were problems with employees receiving awards and tracking of the distribution of awards.

**12**

**19. Counselor's Suggestions to Management Official(s) to resolve complaint**

Counselor met numerous times with Complainant, Representative and Management Officials to attempt to reach a settlement agreement. Issues discussed included reassignment; development plan; desk audit and identifying a mutually agreeable party who would conduct the desk audit.

**20. Final Action by Management Officials(s) based on counselor's suggestions**

In response to both issues, Management offered a settlement to Complainant, which was ultimately rejected. Management offered Complainant two weeks of administrative leave in lieu of taking leave without pay during the holidays. This administrative leave provision was accepted and granted.

**21. Summary description of complaint issues as developed during counseling. (Specify type of discrimination alleged and actions which Complainant believes to be discriminatory. Show dates of occurrences.)**

See Section 18.

**22. Remedial Action Desired**

Complainant's final request was a position in a 201 or 301 job series and to be made whole.

**23. Grievances and Appeals** N/A

| **24. Total Number of Hours Spent Counseling this Case. (Include all contacts, preparation and travel time.)** | **25. Date of Final Interview** | **26. Date of Report** |
|---|---|---|
| 40 | 2/21/06 | 2/28/06 |

**27. Counselor's Signature**

(X) *Paula St Clair*

**28. Enclosures (List and Tab)**

| TAB | DOCUMENT NAME | SOURCE |
|---|---|---|
| Tab A: | Statement of Anonymity | EEO Counselor |
| Tab B: | Designation of Individual Representative | EEO Counselor |
| Tab C: | EEO Counselor Checklist | EEO Counselor |
| Tab D: | Extension of Counseling Period dated 1/12/06 | EEO Counselor |
| Tab E: | Extension of Counseling Period dated 2/16/06 | EEO Counselor |
| Tab F: | **Merit Promotion Package:** | Human Resources |
| | Merit Promotion Certificate | |
| | Position Description | |
| | Qualifications Standards for General | |
| | Schedule Positions | |
| | Vacancy Announcement MP-HQ-06-024 | |
| | Applicant's Application for Employment | |
| | Selectee's Notification of Personnel Action (SF 50) | |
| Tab G: | Notice of Right to File | EEO Counselor |

**13**